IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:24-CR-23-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| ALEXANDER DOUGLAS KUHN, | ) | |
| | ) | |
| Defendant. | ) | |

On April 24, 2024, a grand jury in the Eastern District of North Carolina indicted Alexander Douglas Kuhn ("Kuhn" or "defendant") for three counts of manufacturing or producing child pornography in violation of 18 U.S.C. § 2251(a) and (e), nine counts of distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b), one count of receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2) and (b), and one count of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). See [D.E. 1]. On September 2, 2025, Kuhn moved to suppress evidence obtained from his cellphone under the Fourth Amendment [D.E. 82] and his statements under the Fifth Amendment [D.E. 84]. That same day, Kuhn also filed exhibits [D.E. 83, 85]. On October 14, 2025, the United States responded in opposition and filed exhibits [D.E. 92]. On October 19, 2025, Kuhn replied regarding the cellphone evidence [D.E. 95] and the statements [D.E. 96]. On October 21, 2025, the United States moved to reopen and extend the deadline to respond to Kuhn's motion to suppress his cellphone evidence [D.E. 97]. The court granted the motion [D.E. 98]. On October 25, 2025, the United States responded to Kuhn's motion to suppress his cellphone evidence [D.E. 99]. On October 30, 2025, Kuhn replied [D.E. 105]. On November 7, 2025, the court held an evidentiary hearing concerning the motions. As explained below, the court denies Kuhn's motions to suppress.

I.

Homeland Security Investigations, Greensboro, Special Agent Zachary Neefe ("S/A Neefe") created an online persona to conduct investigations into child sexual abuse. See [D.E. 83-1] 16. S/A Neefe created a profile on Grindr, a dating application targeted towards gay, bisexual, and transgender people. See id. at 15–16.

On June 22, 2023, a Grindr profile, titled "FWB," expressed interest in S/A Neefe. See id. at 17. S/A Neefe struck up a conversation. See id. at 19. After several exchanges, S/A Neefe asked "FWB" if he was "good with jailbait/yung?" Id. at 20. "FWB" responded, "Yesss" before he stated, "Love Incest myself. Used to play with family growing up." Id. "FWB" then expressed interest in moving the conversation off Grindr and onto another application. See id. at 21. "FWB" preferred Session, an encrypted chat application, but the two settled on Discord. See id. S/A Neefe sent "FWB" his Discord username, and "FWB" responded, "I sent the request." Id. at 22. S/A Neefe received a "friend" request on Discord from "Ordi#2876." See id.

At 12:30 p.m., S/A Neefe and Ordi#2876 resumed their conversation on Discord. See id. S/A Neefe operated under the ruse that he had a 12-year-old son who "needs experience." Id. at 23. Ordi#2876 asked S/A Neefe if he had helped his son gain experience, to which S/A Neefe told him he had not because he was afraid. See id. Ordi#2876 then disclosed that he was located in New Bern, North Carolina, and lived in a home with three minors. See id. at 25. When asked whether he "played"[1] with the minors, Ordi#2876 responded, "Yes I do. The youngest one atleast

---

[1] In the chats, Kuhn uses "play" to mean sexual play. See, e.g., id. at 27 ("Reminds me of my brother in law when he was 10 I'd play with him." (emphasis added)); id. at 33 ("I used to just start playing and licking her when I'd change her diapers. Eventually asking if she wanted to feel my penis. Even let her lick it." (emphasis added)); id. at 34 ("I do have several picks of me and her playing if you ever have anything you'd want to exchange." (emphasis added)); id. at 50 ("I was playing with his grand kids with him. Sooooo hot." (emphasis added)).

[sic]. The other two not so much only because idk if they'd tell anyone or not." Id. at 25. Later in the conversation, Ordi#2876 admitted that he had "played" with the two older minors when they were little. Id. at 43. Ordi#2876 disclosed that the youngest minor, who he currently "played" with, was three years old.[2] Id. Ordi#2876 then sent a clothed photo of Minor 1 to S/A Neefe. See id. at 27. Ordi#2876 intimated that he had child sexual abuse images of Minor 1 but would not share them unless they were reciprocated. See id. at 28.

Ordi#2876 and S/A Neefe then discussed meeting in person and what they would allow the other to do to the children. Ordi#2876 discussed a desire to sodomize the 12-year-old boy. See id. at 29. And when the discussion turned to sexual contact with Minor 1, Ordi#2876 stated that Minor 1 is "too small to penetrate," but Minor 1 "can stroke you and you can lick" and "cum all over" Minor 1. Id. at 31. Ordi#2876 then insinuated that he had ejaculated on Minor 1 in the past. See id. Ordi#2876 described licking Minor 1 while changing Minor 1's diapers, which evolved into Minor 1 touching him and performing oral sex. See id. at 33. Ordi#2876 admitted that he had this type of sexual contact with Minor 1 at least "a few times a week" but "sometimes daily." Id. at 37.

Ordi#2876 then reinitiated the earlier conversation about swapping child sexual abuse material, stating "I do have several pics of me and [Minor 1] playing if you ever have anything you'd want to exchange." Id. at 34. Ordi#2876 then sent a photo of a shirtless small-chested pre-pubescent Caucasian minor with blonde/brown hair to S/A Neefe. But based on training and experience, S/A Neefe believed this was a different child, not Minor 1. The following day, on June 23, 2023, the conversation reconvened and Ordi#2876 again asked S/A Neefe for a photo of

_____

[2] The court will refer to the three-year-old child as Minor 1.

3

the 12-year-old boy. Ordi#2876 followed up the request by stating that in exchange, he would send him a "pic of [his] cock all over [Minor 1]." Id. at 39.

S/A Neefe continued these conversations with Ordi#2876 through July 11, 2023. Throughout this time, Ordi#2876 bragged about performing oral sex on Minor 1 and sent a photo of his erect penis with pre-ejaculate fluids present. See id. at 49, 53. Moreover, when describing his past Internet relationships, Ordi#2876 stated that he met up with a grandfather on the west coast, with whom he previously exchanged child sexual abuse content, and he and the grandfather "played" with the grandkids. Id. at 50.

While these conversations were ongoing, S/A Neefe issued Homeland Security Investigation subpoenas to determine the identity of "Ordi#2876." See [D.E. 92] 3. Both the IP address and the emails used by "Ordi#2876" were associated with Alexander Kuhn, an active duty Marine stationed at Cherry Point. See id. Investigators discovered Kuhn was married and lived in a home with three minors. See id. S/A Neefe then contacted Special Agent Addy Penniman ("S/A Penniman"), who was assigned to the Cherry Point area, to take charge of the investigation. See id. Homeland Security also coordinated with Naval Investigation Criminal Services ("NCIS"). See id. NCIS told S/A Penniman that, according to military records, Kuhn had been suicidal. See id.

On July 13, 2023, Magistrate Judge Robert B. Jones, Jr., authorized two federal search warrants: one for Kuhn's person and another for Kuhn's residence. See [D.E. 83-1]; [D.E. 83-2]. Aside from the place or person to be searched, the warrants are substantively identical. When executed on July 19, 2023, the warrants had the following documents attached: the warrant applications, S/A Penniman's affidavit, and Attachments A through C. S/A Penniman's affidavit was incorporated by attachment and directly sought authorization to search Kuhn's cellphone. S/A

4

Penniman's affidavit requested "that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment C to include a full forensic examination of any computers, electronics, and related devices listed here." [D.E. 83-2] 71; [D.E. 83-1] 71. Judge Jones signed below this request. Further, the warrants incorporated by attachment and reference Attachment C [D.E. 83-1, 83-2], which authorized the "search and/or seizure" of the items listed in Attachment C, including "mobile telephone devices." [D.E. 83-1] 74; [D.E. 83-2] 74. Among other things, Attachment C also authorized S/A Penniman to seize operating systems, applications, communications programs, chat logs, e-mail messages, electronic messages, computer files, digital data files, and web cache information. See [D.E. 83-1] 75–78; [D.E. 83-2] 75–78. Attachment C stated that Kuhn must provide biometric features for "devices . . . capable of containing and reasonably could contain fruits, evidence, information, contraband or instrumentalities of the offense(s) . . . for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant." [D.E. 83-2] 76; [D.E. 83-1] 76.

As a United States Magistrate Judge, Judge Jones issued the search warrants under Federal Rule of Criminal Procedure 41. Although most search warrants must be executed within 14 days, warrants seeking electronically stored information authorize the seizure of devices storing media or information and "authorize[] a later review of the media or information" "[u]nless otherwise specified." Fed. R. Crim. P. 41(e)(2)(B). Judge Jones did not prohibit a later review or limit the time that law enforcement had to conduct a seizure on the electronically stored information in Kuhn's electronics seized during execution of the search warrants. Thus, the agents were allowed to conduct "a later review of the media [and] information." See id.

On July 19, 2023, law enforcement executed the search warrants. At approximately 6:40 a.m., Special Agent Richard Everhart ("S/A Everhart") and Detective Ashton Craft ("Detective

5

Craft") of the Craven County Sheriff's Office ("CCSO") watched Kuhn exit his house and approach his truck. See [D.E. 85-3] 3. Once Kuhn was inside his truck, Detective Craft activated his blue lights without a siren and pulled his patrol car into the driveway, blocking the exit. See id. S/A Everhart and Detective Craft approached Kuhn's truck with their guns drawn and ordered Kuhn to exit his truck and place his hands behind his back. See id. Kuhn complied and was handcuffed while Detective Craft searched Kuhn to check for weapons. See id. S/A Everhart and Detective Craft reholstered their weapons once Kuhn was detained. The officers estimate that their guns were drawn for only 60 to 90 seconds. S/A Everhart informed Kuhn of the search warrants and their purpose for being there, and Kuhn replied that he would cooperate with any questioning. See id. Kuhn said he knew his life was over, and he wanted to talk with his wife to provide her with an explanation. See [D.E. 92] 4. Kuhn spontaneously told investigators he knew she would not stay with him and wanted to tell her that he "did it." Id. S/A Everhart then searched Kuhn's truck. See [D.E. 85-3] 3. During the search of Kuhn's truck, investigators located Kuhn's cellphone, a Google Pixel 6. See [D.E. 92] 4. S/A Everhart told Kuhn that he needed his passcode to execute the search warrants. Kuhn told S/A Everhart the passcode and told investigators they would find a "bunch of stuff" on the phone. Id.

After S/A Everhart and Detective Craft detained Kuhn, other law enforcement agents approached Kuhn's residence. Approximately 15 to 20 law enforcement personnel were present at the scene during the execution of the warrants. Law enforcement brought this many people because of the danger arising from executing a search warrant on a person suspected of sexually abusing minors in his home and producing child pornography. Officers were concerned about potential violence based on Kuhn's familiarity and access to weapons as a Marine. Furthermore,

officers were concerned about a suicide risk based on their training and experience in child exploitation cases and Kuhn's prior suicidal ideation.

While Kuhn was detained, Investigator Ashley Salter ("Salter") of CCSO knocked on the front door of Kuhn's home, which featured a sign that read, "Hold on. We're probably not wearing pants." [D.E. 92-1]. Kuhn's wife opened the door, naked. Once inside, Salter found two minors in the master bedroom bed, also naked. After Salter entered, the oldest minor, who wore only underwear, walked downstairs.

After Salter's encounter with the wife and minors, officers grew concerned that the wife may be involved in Kuhn's sexual misconduct. S/A Penniman's audio recording device captured a conversation among officers about how to proceed. The first officer told S/A Penniman that Kuhn was "ready to tell [them] everything" but first wanted to talk to his wife and give her an explanation. Audio Recording ("AR") [D.E. 85-1] 0:00:57–0:01:02. When asked what Kuhn said about his phone, the officer told S/A Penniman that Kuhn said, "You are going to find some stuff. . . . It is all on the phone." Id. at 0:01:07–0:01:21. An officer then stated that he preferred to get Kuhn's "side of the story" before allowing Kuhn to talk with his wife. Id. at 0:01:33–0:01:41. Sergeant David Moore ("Sgt. Moore") of CCSO quickly reiterated the "odd" fact that the wife and two minors "were asleep in the bed completely naked," amplifying concern about the wife's involvement in Kuhn's sexual misconduct. Id. at 0:01:40–0:01:51.

S/A Penniman then told the officers that Kuhn would not be allowed to talk to his wife before each was interviewed separately. See id. at 0:01:53–0:02:01. An officer then told S/A Penniman that separating Kuhn and his wife was the right call out of fear that the wife would instruct Kuhn to "not tell them anything." Id. at 0:02:01–0:02:08.

7

S/A Penniman then approached Kuhn, who was still handcuffed, and had the following

exchange:

| Agent Penniman | "We are going to, if you are ok with it, we are going to step in [the SBI trailer] and talk to you first, and explain everything that is going on and then once we kind of get a better idea of our situation here we will coordinate you speaking with your wife. Okay, this is just at this point the way we want to handle it. Are you ok with . . ." |
| --- | --- |
| Mr. Kuhn | "We can just stand here if you want to, but I would really like to talk to her first." |
| Agent Penniman | "Okay, that's not usually how things work in these situations, um . . ." |
| Mr. Kuhn | "I understand." |
| Agent Penniman | "I would like to sit down and explain to you like what's going on, go over my search warrant and then from there we can discuss things with your wife." |
| Unidentified officer | "It's not like you're getting carted away. We are going to let you talk to her, we are just trying to explain what's going on, if there is something you want me to tell her really quick (mumbled), you are definitely going to be able to talk to her, guaranteed." |
| Agent Penniman | "Do you mind uncuffing him?" |

Id. at 0:02:17–0:03:28. SBI Agent Nicholas Deming ("S/A Deming") removed the handcuffs, and

Kuhn, S/A Penniman, and Detective Craft walked into the SBI trailer. See [D.E. 84] 5. The SBI

trailer was a mobile trailer that the agents had brought to the scene that morning. In total, the

officers estimate that Kuhn was handcuffed for approximately five to ten minutes.

8

Inside the SBI trailer, Kuhn sat closest to the exit, S/A Penniman sat or stood across from Kuhn, and Detective Craft sat on a counter adjacent to Kuhn. See Video Recording ("VR") [D.E. 85-2] 0:00:15. Kuhn requested water, which agents provided to him. See id. at 0:00:15–0:00:33. S/A Penniman then reintroduced herself and explained that she and Detective Craft wanted to discuss chats regarding potential crimes against children. See id. at 0:00:56–0:01:31. S/A Penniman stated that she had search warrants for his residence and his person. S/A Penniman went on to say, "You are not under arrest at this time. You are free not to talk to me. I just want to make that clear to you. At this time, we just want to talk to you about what we found and make sure that no children are being harmed in the house. That is our main priority at this time. Okay? If this is something that you are willing to talk to me about, I can go further into the search warrant and discuss that. Is that okay with you?" Id. at 0:01:31–0:01:57. Kuhn responded, "Yes." Id. at 0:01:57–0:01:59.

Kuhn confirmed that his username on Discord was "Ordi#2876" and that the email address associated with the Discord account belonged to him. See id. at 0:02:29–0:03:11. S/A Penniman then asked for the passcode to Kuhn's mobile phone, which Kuhn provided for a second time. See id. at 0:03:20–0:03:25. S/A Penniman referenced Kuhn's earlier comment that the phone contained incriminating content, and asked what Kuhn was referencing. See id. at 0:03:32–0:03:38. Kuhn responded that they would find child pornography. See id. at 0:03:38–0:03:54. S/A Penniman followed up by asking about hands-on conduct with minors. See id. at 0:03:59–0:04:01. Kuhn responded that "when [the minors in the home] were younger, when I would change them, I would lick their pussies, vaginas, sorry." Id. at 0:04:03–0:04:12. Kuhn went on to admit that he touched the minor's genitals, performed oral sex on them, and took photos of them. See id. at 0:04:37–0:04:45. Kuhn then stated the hands-on conduct only involved Minor 1 and had

9

started within the last year. Kuhn then admitted to the Grindr and Discord conversations with S/A Neefe.

Kuhn later discussed the child sexual abuse material he created of Minor 1. See id. at 0:07:51–0:07:58. Kuhn told Penniman he used Session, an encrypted chat application, to exchange this content with about three people. See id. at 0:08:00–0:08:10, 00:10:18–00:10:20. S/A Penniman then asked whether Kuhn would allow the officers to take over the Session account, and Kuhn responded, "Yes." Id. at 0:10:25–0:10:32.

A little over ten minutes into the conversation, Kuhn said, "I am looking at some kind of jail time, right? Based on everything I have said so far." Id. at 0:10:38–0:10:46. Based on Kuhn's statements and the online chats, S/A Penniman believed probable cause existed to support state charges of sexual molestation of Minor 1. See [D.E. 92] 6. Accordingly, S/A Penniman said, "Yeah, pretty much at this time, just based off of what you said, I'm gonna go ahead and just read you your rights so that you're aware because I think at this point with what you've told us, that you will likely be placed under arrest today. Not by me, but it is possible. So I just want, I'm just gonna go ahead and read you your rights." VR 0:10:50–0:12:13. S/A Penniman then read Kuhn his Miranda rights. See id. S/A Penniman ended by saying, "[I]f you understand all your rights and you still want to continue this interview, I'll just need you to print and sign here. And that'll be completely up to you." Id. Kuhn responded by asking S/A Penniman what the pros and cons were if he stopped the interview and asked for a lawyer. See id. at 0:12:19–0:12:27. S/A Penniman told Kuhn she could not give him any legal advice. See id. at 0:12:27–0:12:29. She went on to tell Kuhn that continuing the interview would allow him to give his side of the story. See id. at 0:12:29–0:12:45. Detective Craft added, "We will help you, if you help us." Id. at 0:12:59–0:13:02. Kuhn signed the Miranda waiver. See id. at 0:13:10–0:13:24; [D.E. 92-3].

10

Once the interview resumed, S/A Penniman and Kuhn discussed Kuhn's role in the military. See id. at 0:14:00–0:14:20. The conversation then returned to Kuhn's chat with S/A Neefe. S/A Penniman referenced Kuhn's comments that he had sexually abused the two older minors. See id. at 0:14:56–0:15:11. Kuhn explained that he wrote that in the chat, but it was not accurate. See id. at 0:15:11–0:15:16. At that point, Kuhn started coughing and gagging and S/A Penniman called an officer outside and asked him to get Kuhn a second water. See id. at 0:16:00–0:16:15.

S/A Penniman then returned to Kuhn's earlier comment that the hands-on conduct with Minor 1 started within the last year. See id. at 0:16:35–0:16:45. After confirming that was an accurate representation of his earlier answer, S/A Penniman asked Kuhn whether an event triggered the hands-on conduct. See id. at 0:16:48–0:16:54. Kuhn explained that his brother sexually abused him as a child. S/A Penniman confirmed that Kuhn downloaded Grindr to talk to men and asked whether Kuhn was primarily interested in boys. See id. at 0:20:00–0:20:19. Kuhn responded that he was not particularly interested in boys and provided a further inaudible explanation. See id. at 0:20:20–0:21:00.

S/A Penniman asked Kuhn if he noticed any changes in Minor 1 after the abuse started, to which Kuhn said he did not. S/A Penniman then asked where the first instance of abuse with Minor 1 took place. See id. at 0:21:49–0:21:54. Kuhn explained that it took place in the Fall of 2022 "here" at his house when he was alone with Minor 1. Id. 0:21:49–0:22:04. Kuhn also admitted he took pictures and videos during that incident. See id. at 0:0:22:04–0:22:21.

S/A Penniman went on to ask where the photos and videos of Minor 1 were stored, and Kuhn told her they were in Session. See id. at 0:22:46–23:00. Kuhn admitted he deleted the photos and videos from his phone but could share the content with other Session users by

11

forwarding the photos and videos from the app. See id. at 0:23:22–0:23:42. Kuhn admitted to having other child sexual abuse material on his phone, including photos a grandfather sent to him of his minor grandchildren. See id. at 0:25:15–0:25:28.

Kuhn again stated that he wanted to talk to his wife. S/A Penniman candidly replied that she had been reluctant to allow Kuhn to speak with his wife because, when officers entered the house, "the [minors] were in bed with [his wife] naked." Id. at 0:28:35–0:28:45. Kuhn explained that was normal, but that his wife was in no way involved in his behavior. See id. at 0:29:22–0:29:35.

S/A Penniman then recapped the information Kuhn had given her and asked how Kuhn logged into Session. Kuhn stated that he could not remember the email and password he used but that he never logged out of it. See id. at 0:32:40–0:33:05. S/A Penniman reiterated that she needed the password to take over the account and asked Kuhn to let her know if he remembered it. See id. at 0:33:05–0:33:36. S/A Penniman then asked Kuhn about his chats that referenced swapping photos with other individuals and inquired into what content he planned to swap. See id. at 0:35:40–0:35:50. Kuhn referenced the photos and videos he took of Minor 1. Kuhn stated that the first video shows him "going down" on Minor 1, and the second video shows him "rubbing himself on" Minor 1's genitalia. Id. at 0:36:26–0:36:45. S/A Penniman then asked about the pictures of Minor 1, and Kuhn told her there were about three pictures of Minor 1 that he had exchanged. See id. at 0:37:45–0:38:00.

At the 38:30 video mark, Kuhn stated that he "ha[d] given a lot of information . . . and would like to seek counsel." Id. at 0:38:30–0:38:45. The questioning stopped.

12

Kuhn said that he still wanted to talk with his wife, and S/A Penniman informed him that law enforcement agents would have to be present for their conversation. See id. at 0:38:45– 0:38:55. Kuhn said that he understood and still wanted to speak with her. See id.

Detective Craft left to retrieve Kuhn's wife. See id. at 0:39:04. Meanwhile, Kuhn asked S/A Penniman if he could call his mother to get her to come down and help his wife. See id. at 0:39:15–0:39:45. S/A Penniman told Kuhn he would have a chance to call his mother. See id. Approximately four minutes later, Kuhn's wife entered the SBI trailer. See id. at 0:43:05. Kuhn told his wife he had sexual conversations with people about kids. See id. at 0:43:31–0:43:37. Kuhn then told her that he "made a move" on Minor 1 and "licked her." Id. at 0:43:38–0:43:51. Kuhn explained that his sexual conversations were for his own gratification. See id. at 0:44:37– 0:44:48. Kuhn said that in the moment, he did it to "get off," but he regretted it later. Id. at 0:45:45–0:46:08. After apologizing to his wife, Kuhn stepped outside for fresh air. See id. at 0:48:41. S/A Penniman continued discussions with Kuhn's wife and explained the extent of Kuhn's admissions. See id. at 0:48:41–1:00:20. S/A Penniman also told Kuhn's wife that the officers had a search warrant for all electronics in the home. See id. at 0:54:45–0:55:00.

Once S/A Penniman finished talking to Kuhn's wife, they both left the SBI trailer and Kuhn walked back inside. S/A Penniman gave Kuhn her phone to call his parents. Kuhn called his mother and told her that he was "getting arrested" for "child pornography and child molestation" of Minor 1. Id. at 1:24:05–1:24:18. Kuhn explained that he had "conversations with people online" and he "acted on it" with Minor 1 and "got caught." Id. at 1:24:28–1:24:50. After this phone call, Kuhn was arrested and the video ended.

Pursuant to the search warrants, digital forensic examiner William Krieger ("Krieger") forensically examined Kuhn's cellphone. Krieger located "nude, lascivious images" of minors.

13

[D.E. 92] 9. The examination also revealed photos and videos depicting the sexual abuse of Minor 1. See id. The cellphone also contained chats where Kuhn discussed the sexual abuse of minors and distributed photos and videos of the abuse. Investigators also found images of two of the minors wearing a strap-on penis. See id.

II.

Kuhn moves to suppress all statements he made on the morning of July 19, 2023, arguing that law enforcement violated his Fifth Amendment rights. See [D.E. 84] 1. Kuhn also moves to suppress all derivative fruits of his interviews, including the contents of his cellphone. See id. Additionally, Kuhn moves to suppress the statements as involuntary under the Fifth Amendment's Due Process Clause. See id. at 17.

Having reviewed the evidence in the recordings and at the hearing and having assessed the credibility of the witnesses, the court finds that during the initial conversation near Kuhn's truck and throughout the SBI trailer interview, Kuhn was not in custody for purposes of Miranda. Thus, Kuhn's statements are admissible.

Alternatively, the court finds that even if Kuhn was subject to a custodial interrogation, Kuhn was read his Miranda rights in the SBI trailer interview after approximately ten minutes of questioning, and agents did not employ a "deliberate two-step strategy." See Missouri v. Seibert, 542 U.S. 600, 604 (2004). Thus, Seibert does not apply, and the court declines to suppress Kuhn's statements after being Mirandized. The court also finds that all of Kuhn's statements were voluntary under the Fifth Amendment's Due Process Clause.

A.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. To ensure this constitutional

14

guarantee, the Supreme Court requires law enforcement to inform individuals who are in custody of their Fifth Amendment rights before a custodial interrogation. The warnings are known as Miranda warnings. See Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001). Miranda applies only to custodial interrogations. See Miranda, 384 U.S. at 444. Without Miranda warnings, evidence the police obtain from a custodial interrogation is generally inadmissible. See id.; United States v. Hargrove, 625 F.3d 170, 177 (4th Cir. 2010); Parker, 262 F.3d at 419.

Miranda warnings are not required when a person is questioned during a Terry stop or a traffic stop. See Berkemer v. McCarty, 468 U.S. 420, 442 (1981); United States v. Leshuk, 65 F.3d 1105, 1108–09 (4th Cir. 1995); accord Howes v. Fields, 565 U.S. 499, 509–10 (2012); Maryland v. Shatzer, 559 U.S. 98, 112 (2010); United States v. Leggette, 57 F.4th 406, 410–14 (4th Cir. 2023); United States v. Gardner, 823 F.3d 793, 801 (4th Cir. 2016), abrogated on other grounds by Stokeling v. United States, 586 U.S. 73 (2019). A temporary and brief detention, such as a Terry or traffic stop, "curtails the 'freedom of action'" of the individual, but it does not mean the individual is "in custody" under Miranda. See Berkemer, 468 U.S. at 435–36, 442. Like Terry and traffic stops, the Fourth Amendment permits the detention of individuals present at a location where agents are executing a search warrant. See Michigan v. Summers, 452 U.S. 692, 705 (1981), overruled on other grounds by Crawford v. Washington, 541 U.S. 36 (2004); Hargrove, 625 F.3d at 179; United States v. Photogrammetric Data Servs., 259 F.3d 229, 239 (4th Cir. 2001). Such detentions typically do not rise to the level of "custody." See Hargrove, 625 F.3d at 179 (stating that only in "appropriate circumstances" will securing a premises and controlling occupants pursuant to a search warrant put the suspect in "custody" under Miranda and finding that the suspect was not in custody despite officers entering the home shortly after 6:00 a.m. with weapons

15

drawn and pointed at the suspect, conducting an initial sweep of the residence, and patting down the suspect).

To determine whether an individual is "in custody" under Miranda, the court must decide whether, under the totality of the circumstances, the "suspect's freedom of action [was] curtailed to a degree associated with formal arrest." Berkemer, 468 U.S. at 440 (quotations omitted); see, e.g., Leggette, 57 F.4th at 410–14; United States v. Pressley, 990 F.3d 383, 388 (4th Cir. 2021); United States v. Giddins, 858 F.3d 870, 879 (4th Cir. 2017); Gardner, 823 F.3d at 801; United States v. Hashime, 734 F.3d 278, 282–83 (4th Cir. 2013); Hargrove, 625 F.3d at 178; United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007); United States v. Uzenski, 434 F.3d 690, 704–05 (4th Cir. 2006); Photogrammetric Data Servs., 259 F.3d at 240–42; United States v. Howard, 115 F.3d 1151, 1154 (4th Cir. 1997). To conduct this inquiry, the court must ask two questions. First, the court must ask whether a reasonable person would have felt that he was at liberty to leave. If a reasonable person would not have felt at liberty to leave, then the court also must ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda." Leggette, 57 F.4th at 410 (quotations and citations omitted); see Howes, 565 U.S. at 509; Gardner, 823 F.3d at 801.

One factor to consider in determining whether the suspect is in custody is whether law enforcement advised the suspect that he was not under arrest. See Giddins, 858 F.3d at 879–87 (holding that a suspect who did not know officers had an arrest warrant, was falsely told that he was free to leave, and was led to believe he had to answer questions to get his impounded car back was in custody under Miranda); Hargrove, 625 F.3d at 178–82 (holding that a suspect who was advised that he was not under arrest and that he was free to leave, and was thereafter interviewed at his kitchen table, was not "in custody"); Colonna, 511 F.3d at 435–36 (holding that where

16

"coercive pressures existed," and "a reasonable man in [the suspect's] position would have felt that his freedom was curtailed to a degree associated with formal arrest," the suspect was "in custody" despite having been advised that he was "not under arrest"); Davis v. Allsbrook, 778 F.2d 168, 171–72 (4th Cir. 1985) ("Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, it is not a talismanic factor." (citation omitted)). Other factors include "the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant." United States v. Weaver, 282 F.3d 302, 312 (4th Cir. 2002); see Hargrove, 625 F.3d at 178. For example, in Hargrove, the Fourth Circuit concluded that the suspect was not in custody. See 625 F.3d at 177–82. Agents told Hargrove that he was not under arrest and was free to leave. See id. at 179. Hargrove was not handcuffed during the interview. See id. at 179–80. Agents did not draw their weapons during the interview. See id. at 180. And the conversation was "amicable and nonthreatening in tone." Id. at 180.

In addition, the court also can consider whether the suspect was isolated and separated from family. See Hashime, 734 F.3d at 283. If officers are simultaneously interviewing a family member and the suspect, however, separation from that individual is not evidence of custody. See Hargrove, 625 F.3d at 175, 181 (stating that the suspect was not allowed to see his minor child because she was being interviewed and that this limitation was "minor" under the circumstances).

1.

As for the conversation near the truck, the court finds that Kuhn was not in custody. Kuhn focuses on the SBI trailer interview when discussing the custody factors. But Kuhn made incriminating statements near his truck before his interview in the SBI trailer, including statements

17

that he knew his life was over, that he wanted to tell his wife he "did it," and that the officers would find a "bunch of stuff" on his phone. Kuhn also provided his phone passcode to S/A Everhart after he asked for it.

As mentioned, as Kuhn prepared to leave for work in his truck at approximately 6:40 a.m., Detective Craft pulled his patrol car into the driveway with his blue lights on, blocking Kuhn's exit. S/A Everhart and Detective Craft approached Kuhn's truck with their weapons drawn and ordered Kuhn to exit his truck and place his hands behind his back. Kuhn complied and was handcuffed while Detective Craft searched Kuhn for weapons. The officers reholstered their guns once Kuhn was detained. In total, the officers estimate their guns were drawn for only 60 to 90 seconds. S/A Everhart informed Kuhn of the search warrants and their purpose, and Kuhn replied that he would cooperate and answer any questions. S/A Everhart proceeded to search Kuhn's truck. Meanwhile, Kuhn spontaneously made several incriminating statements. Once agents located and seized Kuhn's Google Pixel cellphone, S/A Everhart told Kuhn that he needed the passcode to his phone to execute the search warrant. Kuhn provided it.

Although briefly detaining Kuhn "curtail[ed his] 'freedom of action,'" Kuhn was not "in custody" under Miranda. See Berkemer, 468 U.S. at 435–36; Leggette, 57 F.4th at 410–14; Gardner, 823 F.3d at 801; Leshuk, 65 F.3d at 1108–10. The officers lawfully detained Kuhn while they searched him and his truck pursuant to the warrants. See Summers, 452 U.S. at 705; Hargrove, 625 F.3d at 179; Photogrammetric Data Servs., 259 F.3d at 239. Although the officers approached with their guns drawn, the officers put them away once Kuhn was detained. See Hargrove, 625 F.3d at 179 (stating that securing a premises and controlling occupants pursuant to a search warrant typically does not put a suspect in "custody," and finding that the suspect was not in custody despite officers entering the home in the early hours with their weapons drawn and

18

pointed at the suspect, conducting an initial sweep of the residence, and patting down the suspect). At the truck, the officers asked Kuhn approximately three questions and their conversation lasted approximately two minutes. See Gardner, 823 F.3d at 801 (stating that an individual is not in custody for purposes of Miranda when an officer detains him to ask "a moderate number of questions . . . to try to obtain information confirming or dispelling the officer's suspicions." (citation omitted)); United States v. Brobst, 558 F.3d 982, 996 (9th Cir. 2009) (stating that questioning for "two minutes or so" weighs against custody); United States v. Gregory, 891 F.2d 732, 735 (9th Cir. 1989) (holding that the questioning was non-custodial, in part because it "lasted only a few minutes"). Kuhn was only handcuffed for approximately five to ten minutes before he walked unhandcuffed with S/A Penniman and Detective Craft to the SBI trailer.

Kuhn spoke with the officers and willingly admitted his guilt during this brief interaction near his truck. Even if Kuhn did not feel free to leave, that fact did not convert this brief questioning into the functional equivalent of a "stationhouse interrogation" that required Miranda warnings. See Leggette, 57 F.4th at 410; Gardner, 823 F.3d at 801. Thus, like a Terry or traffic stop, this brief detention to check for weapons and search the truck was not a custodial interrogation. Accordingly, Kuhn's statements near his truck in the driveway are admissible.

2.

As for the SBI trailer interview, the court finds that Kuhn was not in custody when questioned in the SBI trailer. At approximately 6:47 a.m., S/A Penniman asked Kuhn if he was okay to speak with her, and Kuhn said that he was. Kuhn asked to speak with his wife first, but S/A Penniman said that Kuhn could speak with his wife after they discussed the search warrants.[3]

---

[3] As mentioned, moments before that statement to Kuhn, S/A Penniman decided that other officers should interview Kuhn's wife separately, after Sgt. Moore told S/A Penniman that Kuhn's wife and two minors were "asleep in the bed completely naked." Because officers were

19

S/A Deming removed Kuhn's handcuffs after only five to ten minutes of being detained, and Kuhn entered the SBI trailer at approximately 6:50 a.m. Kuhn sat closest to the exit, which was immediately to his right. S/A Penniman sat or stood across from Kuhn, and Detective Craft sat on a counter adjacent to Kuhn. S/A Penniman gave Kuhn water at the start of the interview. S/A Penniman told Kuhn that she was investigating a chat regarding potential crimes against children. S/A Penniman explained the search warrants. S/A Penniman also told Kuhn that he was "not under arrest" and was "free not to talk" with her. S/A Penniman explained that the main priority was to "make sure that no children [were] being harmed in the house." Over the course of the next ten minutes, Kuhn admitted to sexually molesting Minor 1 and producing child pornography. At the 10:38 video mark, questioning stopped and S/A Penniman read Kuhn his <u>Miranda</u> warnings.

Several objective factors show that Kuhn was not in custody in the SBI trailer. First, S/A Penniman told Kuhn that he was "not under arrest" and did not have to speak with the agents. <u>See</u> <u>Hargrove</u>, 625 F.3d at 178–82. These statements were truthful. The officers did not have an arrest warrant. <u>Cf.</u> <u>Giddins</u>, 858 F.3d at 879–87 (holding that a suspect who did not know officers had an arrest warrant, was falsely told that he was free to leave, and was led to believe he had to answer questions to get his impounded car back was in custody under <u>Miranda</u>). Kuhn argues that in <u>Hashime</u>, the Fourth Circuit disregarded this factor and looked at the "larger setting." 734 F.3d at 283. In <u>Hashime,</u> the Fourth Circuit did look at the larger setting, but <u>Hashime</u> is distinguishable. Although officers told Hashime that he did not have to answer any questions and was free to leave, the officers made statements directly contradicting themselves to Hashime. <u>See</u> <u>id.</u> at 281, 283– 84. Specifically, officers told Hashime that he could not stay in the interrogation room alone and

_____

legitimately concerned that Kuhn's wife could be involved in Kuhn's sexual misconduct, they wanted to speak with each separately first.

that the officers needed the truth even if he did not want to answer the questions. See id. Unlike in Hashime, S/A Penniman and Detective Craft made no such statements to Kuhn.

Second, S/A Penniman and Detective Craft were friendly, calm, and spoke with a nonthreatening tone throughout the interview, even when Kuhn was admitting to vile, incriminating acts. See Hargrove, 625 F.3d at 175–76 (noting that two important findings by the district court were that the suspect was informed he was not under arrest and that the agents were "amicable and nonthreatening in tone"). For example, at one point in the interview, Kuhn described licking the minors' "pussies," and then quickly apologized for his language. S/A Penniman responded by saying, "Whatever you need to say, I am not here to judge you. I am just trying to find out the facts, so don't worry, whatever you need to say, you just say it to me. I have been doing this for a long time." VR 0:04:12–0:04:22.

Third, only S/A Penniman and Detective Craft were present in the SBI trailer, and neither displayed nor touched their weapons during the interview. That S/A Everhart and Detective Craft drew their guns for 60 to 90 seconds when they removed Kuhn from his truck earlier that morning does not support finding custody, especially when S/A Penniman and Detective Craft did not touch or draw their weapons during the interview. See Hargrove, 625 F.3d at 177, 180 (finding that no custody existed during an interview, even though numerous officers entered the suspect's home with their weapons drawn and aimed an M-16 at the suspect, because during the interview, those same officers never displayed their weapons). Moreover, there was no physical contact between Kuhn and S/A Penniman and Detective Craft during the interview. See id. at 179–80.

In opposition, Kuhn argues that several factors support finding that he was in custody in the SBI trailer, including the time, place, and purpose of the interview, the length of the interview,

Kuhn's alleged isolation and separation from his family, and the police-dominated atmosphere. The court disagrees with Kuhn.

As for the time, place, and purpose of the interview, the court finds that this factor weighs against finding that Kuhn was in custody. The interview took place in an SBI trailer adjacent to Kuhn's property. Typically, when an interrogation takes place at a residence, it weighs against custody. See, e.g., Oregon v. Elstad, 470 U.S. 298, 315 (1985) (holding that the environment was not coercive where interview took place in defendant's living room); Hargrove, 625 F.3d at 180–81 (holding that suspect was not "in custody" when he was interviewed at his kitchen table); United States v. Braxton, 112 F.3d 777, 785 (4th Cir. 1997) (en banc) (holding that a suspect was not in custody when he "was interviewed by law enforcement officers around the kitchen table" in his mother's home). But Kuhn cites Hashime, 734 F.3d 278, and argues that an interview in the same residence where police are executing a search warrant supports finding that he was in custody.

In Hashime, the Fourth Circuit explained that when an interview takes place in the home while a search warrant is executed, a "suspect may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." Id. at 284 (quotation omitted). This argument applies when the interview and the search warrant execution both take place in the residence. Kuhn, however, was not interviewed inside his residence. Rather, Kuhn, S/A Penniman, and Detective Craft were in an SBI trailer adjacent to his residence. Kuhn could have terminated the interview and exited the SBI trailer at any time. In fact, S/A Penniman told Kuhn that he did not have to answer any questions and was not under arrest. If he wanted to leave, Kuhn could have. Kuhn, however, chose to stay and speak with S/A Penniman and Detective Craft. Thus, this factor weighs against finding that Kuhn was in custody.

22

Next, Kuhn argues that the purpose of the interview supports finding that he was in custody because he did not ask to speak to S/A Penniman and Officer Craft, and they just wanted to "obtain a full confession." See [D.E. 84] 11. The court finds that Kuhn mischaracterizes S/A Penniman's and Detective Crafts's conduct. When S/A Everhart and Detective Craft briefly detained Kuhn in his driveway, Kuhn told them that he intended to fully cooperate and answer questions. Before interviewing Kuhn in the SBI trailer, S/A Penniman confirmed that Kuhn wanted to speak with her and Detective Craft. S/A Penniman told Kuhn that the purpose of the interview was to ensure the safety of the minors in the home. The concern for the minors' safety was exacerbated when Kuhn's wife answered the door naked, and officers discovered two naked minors in the master bedroom bed and a third minor walking downstairs in her underwear. Moreover, S/A Penniman did not pry or repeatedly ask questions before Kuhn made admissions. Rather, S/A Penniman referenced the online chats and Kuhn's admission that his phone contained incriminating evidence. Kuhn then stated that he molested Minor 1 and produced child pornography while doing it. Thus, the court finds that this factor weighs against finding that Kuhn was in custody.

As for the length of the interview, the court finds that the ten-minute interview before agents Mirandized Kuhn weighs against finding that Kuhn was in custody. Kuhn asserts that the interview lasted for nearly an hour. See [D.E. 84] 12. Untrue. S/A Penniman and Detective Craft interviewed Kuhn for 10 minutes and 38 seconds before questioning stopped and S/A Penniman read Kuhn his Miranda rights. Moreover, even after S/A Penniman read a Miranda warning to Kuhn and Kuhn waived his Miranda rights, the questioning continued for only 28 minutes, creating a total interview time of 38 minutes and 30 seconds. This short duration weighs against finding that Kuhn was in custody. Cf. Hashime, 734 F.3d at 281 (finding the suspect was in custody when the officers did not read Hashime his Miranda rights until two hours into a three-hour

interrogation); Hargrove, 625 F.3d at 174 n.7 (finding that the suspect was not in custody despite the interrogation lasting two hours).

In opposition, Kuhn cites United States v. Morris, 9 F. Supp. 3d 622 (M.D.N.C. 2014), and argues that the district court found the interrogation in Morris to be custodial; therefore, Kuhn's interrogation should be too. See id. at 624, 628. The court rejects this argument. First, in Morris, the agents took the suspect "into a back room, shut the door," and questioned the suspect "for approximately 45 minutes to one hour." Id. at 624. Unlike in Morris, Kuhn's un-Mirandized interview lasted ten minutes, not 45 to 60 minutes. Second, in Morris, the court emphasized that the agents never told the suspect that he was free to leave or that he was not under arrest and told him that he was required to inform the agents before he used the restroom or got up. See id. at 624. Unlike in Morris, agents informed Kuhn that he was not under arrest and was free to not answer questions. Thus, Morris provides no comfort to Kuhn.

Next, Kuhn argues that the separation and isolation from his family weigh in favor of finding that he was in custody. The court, however, finds that this temporary separation from his family was proper given that law enforcement needed to simultaneously interview Kuhn's wife in order to ensure that she was not participating in Kuhn's sexual misconduct.

As discussed, during the execution of the search warrant, officers became concerned that Kuhn's wife might be involved in Kuhn's illegal behavior. Specifically, Kuhn's front door featured a sign that read, "Hold on. We're probably not wearing pants." [D.E. 92-1]. When agents knocked in order to enter and execute the search warrant, Kuhn's wife answered, nude. Once inside, Salter found two naked minors in the master bedroom bed and a third minor walking downstairs in only her underwear. S/A Penniman discussed the situation with other on-scene officers, and everyone agreed that Kuhn and his wife should be interviewed separately. Moreover,

24

S/A Penniman assured Kuhn that he would be able to speak with his wife after the interview. And S/A Penniman kept her word. After Kuhn stopped the interview, Detective Craft retrieved Kuhn's wife, who had finished talking with other officers in the residence. Kuhn then spoke with his wife and admitted to molesting Minor 1.

The court also notes that the officers did not initially separate Kuhn and his wife. Rather, Kuhn exited his home to go to work. When Kuhn got to his truck, S/A Everhart and Detective Craft approached him and told him about the search warrants. Shortly thereafter, Kuhn asked S/A Penniman to speak with his wife. But Kuhn's wife did not ask agents in the house to speak with Kuhn. Although Kuhn cites Hashime, 734 F.3d at 283, where the Fourth Circuit explained that a court should consider separation and isolation from family in the custody determination, it was the mother in Hashime, not the 19-year-old suspect in Hashime, who asked to speak with her 19-year-old son. See id. at 284. The officers in Hashime denied the mother's requests even though no family members were potential victims of the 19-year-old son's alleged child pornography offenses or potential accomplices in his alleged illegal behavior. See id.

The family separation in Hashime is distinguishable from the facts in this case. Here, Kuhn's separation from his wife (a potential accomplice) and the minors (alleged victims) was proper and does not weigh in favor of a finding that Kuhn was in custody. See Hargrove, 625 F.3d at 175, 181 (stating that the suspect accused of child sex crimes was not allowed to see his minor child because she was being interviewed, making this separation "minor" under the circumstances).

Kuhn also argues that the police-dominated atmosphere weighs in favor of custody. Kuhn asserts that "18 agents trampled on the privacy of [his] home early in the morning," "blocked [his] driveway," "drew their guns on [him]," and "kept [him] and his wife under constant, separated

25

guard." [D.E. 84] 13. Kuhn believes that these facts are "on all fours" with Hashime, in which the Fourth Circuit held that despite being told that he was not under arrest and free to refuse questioning, Hashime was in custody. Id. at 14; see Hashime, 734 F.3d at 283–84.

Although there was a heavy police presence when executing the search warrants, Hashime is distinguishable, and the heavy police presence does not mean that Kuhn was in custody. In Hashime, federal law enforcement officers suspected Hashime of various child pornography offenses. See Hashime, 734 F.3d at 280. A team of 15 to 30 federal law enforcement agents, equipped with a battering ram, approached Hashime's front door at 9:00 a.m. banging and yelling, "Open the door." See id. Once Hashime's aunt opened the door, officers streamed into the home with their guns drawn. See id. They entered Hashime's bedroom and pointed a gun at him while he was naked and asleep, "having gone to bed at 5 [a.m.] that morning." Id. Hashime put on boxers. See id. Despite the cold weather, agents marched Hashime and his family outside to the front lawn where they stood "only in their nightclothes." Id. When agents finally let Hashime and his family back into the home, agents confined them to the living room and instructed them that if they needed to leave the living room, an officer had to accompany them. See id. at 280–81. Law enforcement then interrogated each family member individually. Id. at 281.

The facts in this case contrast sharply with Hashime. Here, S/A Everhart and Detective Craft waited until Kuhn was outside his home at approximately 6:40 a.m. on July 19, 2023, before they approached him. The sun was up, and Kuhn was in his truck getting ready to drive to work. S/A Everhart and Detective Craft approached Kuhn and had their weapons drawn for only 60 to 90 seconds. Kuhn was awake, dressed for work, and in his driveway. The officers did not use a battering ram to enter Kuhn's house. Agents did not force Kuhn's wife and the minors outside. Instead, the agents knocked on the front door, and Kuhn's wife opened the door and let them inside.

26

Moreover, no evidence suggests that officers restricted Kuhn's wife or the minors' movements in the residence while executing the search warrants. Rather, officers in the residence spoke with Kuhn's wife in one room while the minors were in an adjacent room where Kuhn's wife could still see them.

The tactics used to execute the search warrants were not remotely near the "police-dominated" atmosphere in Hashime. Cf. Hashime, 734 F.3d at 280–81, 284; Colonna, 511 F.3d at 433, 435–36 (finding custodial interrogation where the suspect was awakened in his home when officers kicked open the suspect's bedroom door and ordered him at gunpoint to dress and come downstairs, the suspect's home was occupied by approximately 24 officers, and he remained under guard during questioning). Thus, Hashime does not help Kuhn.

Based on the totality of the circumstances, the court finds that a reasonable person in Kuhn's position would have felt free to terminate the interview with S/A Penniman and Detective Craft. Moreover, the court also finds that the SBI trailer interview did not present the same coercive environment present at a police station. See, e.g., Leggette, 57 F.4th at 410; Gardner, 823 F.3d at 801. Thus, the court denies Kuhn's motion to suppress his statements in the SBI trailer.

B.

Alternatively, the court finds that even if Kuhn was subjected to a custodial interrogation during the first ten minutes of the interview in the SBI trailer, Kuhn's statements after S/A Penniman administered Miranda warnings and Kuhn waived his Miranda rights are admissible. In Missouri v. Seibert, 542 U.S. 600 (2004), the Supreme Court addressed a two-step, "question-first" police strategy in which officers intentionally withheld Miranda warnings, questioned the suspect until securing a confession, and then obtained a waiver and asked the suspect to repeat his confession. See id. at 604 (plurality opinion). The "underlying assumption" to this interrogation

27

method, a plurality of the Court noted, was that "with one confession in hand before the warnings, the interrogator can count on getting its duplicate." Id. at 613. Inserting Miranda warnings "in the midst of coordinated and continuing interrogation" would likely "mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Id. at 613–14 (quotation omitted).

In Seibert, a plurality of the Court listed relevant facts bearing on whether a midstream Miranda warning was effective, including the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the two statements, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. Id. at 615–16. There is no majority opinion in Seibert. Thus, the Fourth Circuit follows Justice Kennedy's concurring opinion, which applies only when agents employ "the deliberate 'question-first' strategy." United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005). In other words, the Fourth Circuit looks to the relevant factors in the Seibert plurality opinion only in the narrow, "infrequent case in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. at 308–09 (cleaned up); Seibert, 542 U.S. at 622 (Kennedy, J., concurring).

The court finds that law enforcement did not deliberately employ a "question-first" strategy in an attempt to obtain Kuhn's confession; therefore, Seibert does not help Kuhn. See Mashburn, 406 F.3d at 309–10. In opposition, Kuhn argues that the conversation between S/A Penniman and the other officers about whether Kuhn could speak with his wife before being interviewed demonstrates "a conscious and deliberate choice to create the most coercive conditions possible to extract a confession from Mr. Kuhn." [D.E. 84] 16. The court disagrees. As discussed, officers were concerned that Kuhn and his wife were involved in sexual misconduct when she answered

the door naked and officers discovered two minors naked in the bed in the master bedroom and a third minor in her underwear. Thus, to preserve the integrity of the interviews and the safety of the minors in the residence, the officers chose to interview Kuhn and his wife separately before they spoke to each other.

Other facts also distinguish this case from Seibert. Notably, S/A Penniman did not merely ask the same questions after she administered the Miranda warnings. Rather, S/A Penniman delved into new topics, such as Kuhn's military experience, his childhood experiences, and his sexual preferences. Given the short duration of the initial un-Mirandized portion of the interview, S/A Penniman revisited certain topics to gather more information. But the recording shows that S/A Penniman did not deliberately manipulate the interview to get Kuhn to make the same admissions he made during the un-Mirandized questioning. Thus, even if Kuhn was subjected to a custodial interrogation before the 10:38 mark (which he was not) and the court were to suppress statements made in that 10:38 period (which it does not), the subsequent Miranda warnings and Miranda waiver rendered Kuhn's later statements admissible.

The court also notes that after law enforcement interviewed Kuhn, Kuhn confessed to both his wife and mother on video. These statements are admissible regardless of Miranda. See Arizona v. Mauro, 481 U.S. 520, 522–23, 527–30 (1987) (holding that a conversation between the suspect and his wife, which took place in the presence of police officers and was recorded by a device located in "plain sight," was not functionally equivalent to custodial interrogation); United States v. Bell, 901 F.3d 455, 463–64 (4th Cir. 2018) (holding that a question about weapons in the home that police directed to the suspect's wife, to which the suspect volunteered a response, was not custodial interrogation); United States v. Kimbrough, 477 F.3d 144, 150–52 (4th Cir. 2007) (holding that questions that the suspect's mother posed to the defendant in the presence of police

officers did not constitute the functional equivalent of custodial interrogation); Rudd v. Beard, No. 08-2021, 2009 WL 2603158, at *3 (E.D. Pa. Aug. 24, 2009) (unpublished) (holding that the suspect was not in custodial interrogation when he made incriminating statements to his co-defendant despite not knowing that the conversation was being recorded because the suspect was "aware of the consequences of the conversation and independently chose to engage in it regardless"); cf. Premo v. Moore, 562 U.S. 115, 123–24, 126–27 (2011) (holding that there was no deficient performance under the Sixth Amendment when an attorney did not move to suppress defendant's confession to police where defendant also had confessed to his brother and his accomplice's girlfriend; Miranda would not apply to defendant's confession to his brother and his accomplice's girlfriend).

C.

Kuhn moves to suppress his statements as involuntary under the Fifth Amendment's Due Process Clause. The court finds that Kuhn's statements were voluntary.

The "mere existence of threats, violence, implied promises, improper influence, or other coercive police activity" does not automatically render a confession involuntary under the Fifth Amendment's Due Process Clause. Braxton, 112 F.3d at 780; see United States v. Holmes, 670 F.3d 586, 591 (4th Cir. 2012). Rather, the court must determine whether these influences rendered the defendant's will "overborne" or "his capacity for self-determination critically impaired." Braxton, 112 F.3d at 780 (quotation and citation omitted); Holmes, 670 F.3d at 591–92; United States v. Pelton, 835 F.2d 1067, 1071–72 (4th Cir. 1987); see Schneckloth v. Bustamonte, 412 U.S. 218, 225–26 (1973); United States v. Byers, 649 F.3d 197, 215 (4th Cir. 2011); United States v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002); Photogrammetric Data Servs., 259 F.3d at 240–42.

To determine whether a defendant's will was overborne or his capacity for self-determination was critically impaired, courts consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." Braxton, 112 F.3d at 781 (quotations and citation omitted); United States v. Umana, 750 F.3d 320, 344 (4th Cir. 2014); Pelton, 835 F.2d at 1071. The court may consider age, education, intelligence, lack of any advice of rights, length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as deprivation of food or sleep. See Schneckloth, 412 U.S. at 225. Circumstances surrounding an interrogation need not be free from any intimidation to be deemed voluntary. See Braxton, 112 F.3d at 780–82; Pelton, 835 F.2d at 1072–74. "[V]ery few incriminating statements, custodial or otherwise, are held to be involuntary." Braxton, 112 F.3d at 786.

Kuhn asserts that his statements were involuntary for two reasons: (1) S/A Penniman and Detective Craft coerced Kuhn into speaking with them by promising Kuhn that he would be able to talk with his wife and (2) Detective Craft implied leniency in exchange for Kuhn's cooperation during the interview. See [D.E. 84] 17–18.

"[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary." United States v. Shears, 762 F.2d 397, 401 (4th Cir. 1985). Government agents can "initiate conversations on cooperation," "promise to make a defendant's cooperation known to the prosecutor," and "may even be able to make and breach certain promises without rendering a resulting confession involuntary." Id. at 401–02. But "there are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness." Id. at 402.

31

When a perceived promise goes unfulfilled, the court must determine whether the promise "was the principal and determinative factor leading to [the] confession." Id. at 402 n.5. The main inquiry remains whether the promise would have been one such that the defendant's will was overborne or his capacity for self-incrimination was critically impaired.

Here, S/A Penniman kept her promise that Kuhn would be able to talk with his wife. In fact, as soon as the interview concluded, Kuhn was able to speak with his wife and do what he told S/A Penniman he intended to do: confess. Kuhn told his wife that he had molested Minor 1 and engaged in chats about children online. S/A Penniman's promise did not render Kuhn's will overborne or critically impair his capacity for self-determination. Compare Ferguson v. Boyd, 566 F.2d 873, 877–79 (4th Cir. 1977) (per curiam) (holding that a confession was involuntary after the defendant was promised that his girlfriend, who was being improperly held without bond away from her young children, would be released if he confessed), with United States v. Robinson, 698 F.2d 448, 455 (D.C. Cir. 1983) (per curiam) (holding that a confession was voluntary even though the defendant was promised that the officer would inform the prosecutor of his cooperation and he would not be arrested or charged that day, which was a promise the officer did not keep), and United States v. Ferrara, 377 F.2d 16, 17–18 (2d Cir. 1967) (holding that a defendant's statements were voluntary despite an agent telling him that if he cooperated with the U.S. Attorney, the agent "felt sure [the defendant] would get out on reduced bail").

Second, Detective Craft's statement that if Kuhn helped the agents, the agents would help him, did not result in Kuhn's will being overborne or critically impair his capacity for self-determination. In the context of the interview, Detective Craft made this statement after Kuhn consented to the agents taking over his Session account to seek to catch other offenders. Thus, Detective Craft truthfully implied that if Kuhn helped the officers and gave them the password and

32

account information, Kuhn's outcome would likely improve. Kuhn was unable, however, to remember his password and provide that information to the agents. Moreover, officers can encourage cooperation without rendering a subsequent confession involuntary. See Mashburn, 406 F.3d at 309–10 (holding the statements were voluntary despite the officer advising the defendant of the penalties he faced if convicted and telling him that the only way he could help himself was to accept responsibility and cooperate); Shears, 762 F.2d at 401–03. Furthermore, the court notes the timing of Detective Craft's statement. Detective Craft made this statement to Kuhn over ten minutes into the interview, at which point Kuhn had already confessed to molesting Minor 1 and producing child pornography. Thus, Detective Craft's statement was not the "principal and determinative factor leading to [Kuhn's] confession." Shears, 762 F.2d at 402 n.5.

Other factors support the voluntariness of Kuhn's statements. When Kuhn made the statements, Kuhn was 32 years old and a staff non-commissioned officer in the United States Marine Corps. Kuhn had a successful 14-year military career, where he supervised numerous Marines and demonstrated competency and intelligence. Although there were a large number of law enforcement officers present to execute the warrants, guns were not drawn after Kuhn's initial detention. Moreover, near Kuhn's truck, agents told Kuhn about the search warrants and their purpose for being there. S/A Penniman addressed the search warrants again during the SBI interview and told Kuhn that the purpose of the interview was to ensure the safety of the minors in the home. S/A Penniman told Kuhn that she had seen his Discord chats and that officers also were concerned about his wife's potential involvement, which was the reason for the delay in him speaking with his wife. When Kuhn asked whether he was going to be arrested, S/A Penniman told him, based on his admissions in the first ten minutes of the interview, that state authorities likely would take him into custody. S/A Penniman then read Kuhn his Miranda rights, and Kuhn

33

signed a <u>Miranda</u> waiver. The interview lasted only 38 minutes and 30 seconds. Kuhn was offered and received water two times. Kuhn also stepped outside the trailer to get fresh air. S/A Penniman and Detective Craft were direct and candid with Kuhn but maintained a calm and cordial tone and demeanor throughout the interview. They never raised their voices or pushed back against Kuhn despite his vile admissions.

Based on a totality of the circumstances, the court finds that Kuhn's statements were voluntary under the Fifth Amendment's Due Process Clause. The statements are admissible, and the court denies Kuhn's motion to suppress.

III.

Kuhn moves to suppress all evidence and information obtained from his Google Pixel cellphone and third-party communications over Telegram and Sessions. <u>See</u> [D.E. 82] 1. The court denies Kuhn's motion to suppress.

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "touchstone" of the analysis "under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 108–09 (1977) (per curiam) (quotations and citation omitted). A search or seizure pursuant to a valid warrant is reasonable. The Fourth Amendment, however, "does not specify when a search warrant must be obtained." <u>Kentucky v. King</u>, 563 U.S. 452, 459 (2011). Although warrantless searches are "presumptively unreasonable," courts have recognized "categories of permissible warrantless searches." <u>Fernandez v. California</u>, 571 U.S. 292, 298 (2014); <u>see</u> <u>King</u>, 563 U.S. at 459; <u>Flippo v. West Virginia</u>, 528 U.S. 11, 13–14 (1999) (per curiam); <u>Mimms</u>, 434 U.S. at 108–09; <u>Katz v. United States</u>, 389 U.S. 347, 357 & n.19 (1967)

34

(collecting cases). The good-faith exception occupies one of these categories. See United States v. Leon, 468 U.S. 897, 926 (1984); United States v. Lalor, 996 F.2d 1578, 1583 (4th Cir. 1993).

A.

Kuhn argues: (1) the search warrants' plain language did not authorize a search of his cellphone; (2) even if the warrants authorized a search of his cellphone, the agents were not allowed to search third-party applications on the cellphone such as Telegram or Session; and (3) to the extent the warrants authorized a search of Kuhn's cellphone and applications such as Session and Telegram, the warrants are overbroad, lacking both probable cause and particularity. See [D.E. 82] 15, 18–20, 23–28. The government disagrees with each argument. The court does too.

1.

The warrants gave the officers clear instructions: Where are we authorized to search? Kuhn's residence—"1188 Tebo Road New Bern, North Carolina 28562, See Attachment A." See [D.E. 83-2] 1. Who are we authorized to search? "Alexander Douglas Kuhn (DOB 11/28/1990), See Attachment B." See [D.E. 83-1] 1. What are we authorized to search for and seize? "Evidence of, instrumentalities used in committing, and fruits of the crime of" production, distribution, receipt, or possession of child pornography, "all of which are more particularly described in Attachment C, attached hereto and made a part hereof." See [D.E. 83-1] 1; [D.E. 83-2] 1. What is in Attachment C? Six pages of relevant items to be searched for, seized, and then searched, including computers and mobile telephone devices, e-mail messages, chat logs, electronic messages and other digital data files concerning the production, distribution, receipt, or possession of child pornography. See [D.E. 83-1] 74–79; [D.E. 83-2] 73–79. When are we authorized to execute the search warrants? Between July 13, 2023, and July 27, 2023. See [D.E. 83-1] 1; [D.E. 83-2] 1. When must we finish executing the search warrants? July 27, 2023. See [D.E. 83-1] 1;

35

[D.E. 83-2] 1. Who issued the warrants? Robert B. Jones, Jr., a United States Magistrate Judge. See [D.E. 83-1] 1; [D.E. 83-2] 1.

Federal Rule of Criminal Procedure 41 governs warrants that a United States Magistrate Judge issues. What does executing a warrant issued under Rule 41 mean? Under Rule 41, a warrant that authorizes "the seizure of electronic storage media or the seizure or copying of electronically stored information" carries with it the authority to conduct a later search and review of that media or information on-site or off-site and without a subsequent search warrant. See Fed. R. Crim. P. 41(e)(2)(B); see also Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendment (emphasizing the two-step "process inherent in searches for electronically stored information[:]" (1) officers seize or copy the entire storage medium, such as a cellphone or computer; and (2) officers conduct a later review of the seized electronic storage media or electronically stored information to determine what electronically stored information falls within the scope of the warrant and that review does not require a new search warrant and need not take place within the time period for executing the warrant).

Kuhn argues that "[t]here is no reasonable way to read the warrants . . . as authorizing a search of [his] cellphone." [D.E. 82] 15. Kuhn believes that "[t]he warrants could not be clearer in the limited and definite search authority conveyed, and that authority did not extend to a search of a cellphone." Id. According to Kuhn, agents could only seize his cellphone and needed another search warrant to search its contents. See id. The court disagrees.

In assessing warrants and affidavits in support of warrants, the Supreme Court and the Fourth Circuit have emphasized that "warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and "must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the

opportunity nor judged as an entry in an essay contest." United States v. Moody, 931 F.3d 366, 372 (4th Cir. 2019) (quotations omitted); see United States v. Harris, 403 U.S. 573, 579–80 (1971); United States v. Ventresca, 380 U.S. 102, 108 (1965); Moretti v. Thorsdottir, __ F.4th __, 2025 WL 2921438, at *6 (4th Cir. 2025); United States v. Clenney, 631 F.3d 658, 665 (4th Cir. 2011); United States v. Castro, 881 F.3d 961, 965 (6th Cir. 2018) ("[Warrants] need not meet the rigors of Roget, Merriam, Webster, Strunk, and White. A commonsense contextual reading usually suffices, and usually gets the point the magistrate and officer sought to express."). "A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." Ventresca, 380 U.S. at 108. "[C]ourts should use commonsense standards and resolve disputes in favor of the preference for warrants." United States v. Peterson, 294 F. Supp. 2d 797, 805–06 (D.S.C. 2003), aff'd, 145 F. App'x 820 (4th Cir. 2005) (per curiam) (unpublished); see Ventresca, 380 U.S. at 109.

"As a general rule, a supporting affidavit or document may be read together with (and considered part of) a warrant . . . 'if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.'" United States v. Hurwitz, 459 F.3d 463, 470–71 (4th Cir. 2006) (citation omitted). In the Fourth Circuit, "it is sufficient either for the warrant to incorporate the supporting document by reference or for the supporting document to be attached to the warrant itself." Id. at 471.

Judge Jones authorized two warrants: (1) a warrant for the person to be searched—Kuhn—and (2) a warrant for the place to be searched—Kuhn's residence. See [D.E. 83-1] 1 (incorporating Attachment B and C); [D.E. 83-2] 1 (incorporating Attachment A and C). Judge Jones and S/A Penniman did not know whether the electronic device or devices that Kuhn used to produce, distribute, receive, or possess child pornography would be found on his person, in his truck, or

37

inside his residence. Thus, Judge Jones issued two separate warrants that are substantively identical, except for the place or person to be searched, and agents then executed those warrants. When the agents executed the search warrants, the search warrants included the warrants, the warrant applications, S/A Penniman's affidavits, and Attachments A through C.

Because S/A Penniman's entire affidavit was attached to each warrant upon execution, it is incorporated by attachment (including Attachments A, B, and C). See Hurwitz, 459 F.3d at 471. Thus, S/A Penniman's clear request to search Kuhn's cellphone in both her affidavit and in Attachment C is a part of the warrants. See id. S/A Penniman's affidavits began by requesting permission to "seize and search computers and related devices consistent with the scope of the requested search." See [D.E. 83-1] 11 (emphasis added); [D.E. 83-2] 11 (emphasis added). S/A Penniman then described the need to search for deleted computer files on the electronic devices and stored electronic communications on Kuhn's Discord and Grindr applications. See [D.E. 83-1] 14–15; [D.E. 83-2] 14–15. Law enforcement could not seize these communications unless they first searched for and found the electronic device, seized it, and searched the electronic device for the communications as described in Attachment C.

The affidavits also sought permission for "law enforcement to compel [Kuhn] to unlock any devices requiring biometric access subject to seizure pursuant to this warrant" because without it, "law enforcement personnel may not . . . be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant." [D.E. 83-1] 66, 68 (emphasis added); [D.E. 83-2] 66, 68 (emphasis added); see also [D.E. 83-1] 69; [D.E. 83-2] 69 ("[I]f law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the . . . biometric features, the warrant permits law enforcement personnel" to use Kuhn's fingers or facial

recognition to open the devices.). Biometric access was relevant only if law enforcement was actively searching a digital device. S/A Penniman concluded the affidavits by requesting "that the attached warrant be issued authorizing the <u>search</u> and <u>seizure</u> of the items listed in Attachment C to include a full forensic examination of any computers, electronics, and related devices listed here." [D.E. 83-1] 71 (emphasis added); [D.E. 83-2] 71 (emphasis added).

Attachment C, which is incorporated by attachment and by reference into the warrants, independently authorized a search of Kuhn's phone. <u>Hurwitz</u>, 459 F.3d at 471. The warrants' front page read, "I, [Judge Jones], find that the affidavit(s) . . . establish probable cause to search and seize the person or property described above [(Kuhn and his residence)], and that search will reveal . . . [e]vidence of, instrumentalities used in committing, and fruits of the crime . . . all of which are particularly described in Attachment C, <u>attached</u> <u>hereto</u> <u>and</u> <u>made</u> <u>a</u> <u>part</u> <u>hereof</u>." [D.E. 83-1] 1; [D.E. 83-2] 1 (emphasis added). Attachment C is titled "Property to be Searched And/Or Seized." [D.E. 83-1] 74; [D.E. 83-2] 74.

"The literal sense of <u>and/or</u> is 'both or either.'" Bryan A. Garner, <u>LawProse Lesson #209:</u> <u>Ban "and/or"</u>, LawProse (May 6, 2015), https://lawprose.org/lawprose-lesson-209-ban-andor. Thus, "search and/or seize" at the top of Attachment C means there are three choices: (1) search the item; (2) seize the item; or (3) seize and search the item. <u>See id.</u> When reading Attachment C in its entirety, Judge Jones authorized a search <u>and</u> seizure of the items in Attachment C.

Attachment C authorized "the search of the property identified in Attachment A," which included Kuhn, his truck, and his residence, and "the seizure of the items listed below." [D.E. 83-1] 74; [D.E. 83-2] 74. Kuhn argues that, based on this language, the items in Attachment C may only be seized, not searched. The court disagrees. In interpreting a text of any kind, the court must consider context. <u>See</u> Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation</u>

39

of Legal Texts 167 (2012) ("Context is a primary determinant of meaning."). Attachment C authorized the seizure of operating systems, applications, communications programs, chat logs, e-mail messages, electronic messages, computer files, digital data files, and web cache information. See [D.E. 83-1] 75–78; [D.E. 83-2] 75–78. These items listed in Attachment C are stored on digital devices. Thus, a seizure of these items was impossible unless a search of a digital device was authorized first. Moreover, Attachment C compelled Kuhn to provide biometric features for "any of the devices found on the premises" that are capable of containing evidence of production, distribution, receipt, or possession of child pornography "for the purpose of attempting to unlock the device's security features in order to search the contents as authorized by this warrant." See [D.E. 83-1] 79 (emphasis added); [D.E. 83-2] 79 (emphasis added). To complete the authorized seizures, the search of Kuhn's cellphone was necessary, as evidenced by Judge Jones's authorization in the warrants to compel Kuhn to provide biometric features to open his cellphone.

Despite Kuhn's contention that the warrants could have been drafted more clearly, the court declines to construe the warrants as Kuhn suggests. See, e.g., Ventresca, 380 U.S. at 108; Moody, 931 F.3d at 372; Clenney, 631 F.3d at 665; Peterson, 294 F. Supp. 2d at 805–06. Moreover, S/A Penniman drafted the warrants in haste, concerned that Kuhn was sexually assaulting three minors in his home. See Harris, 403 U.S. at 579; Ventresca, 380 U.S. at 108; Moody, 931 F.3d at 372; Clenney, 631 F.3d at 665. Thus, having reviewed the warrants' language in full, the court finds that the explicit language of the search warrants authorized a search of Kuhn's cellphone.

In opposition, Kuhn cites United States v. Ray, 141 F.4th 129 (4th Cir. 2025), and argues that the court must suppress the evidence from Kuhn's cellphone. In Ray, an active duty Navy engineer was suspected of child sexual abuse and possession of child pornography. See id. at 131. An agent applied for a Command Authorization for a Search and Seizure ("CASS"), a type of

40

military warrant. See id. at 132. The agent's affidavit requesting the CASS asked for "authority to search [the] personal cellular device" and "a full extraction of the phone," but the single page CASS document did not incorporate the agent's affidavit or include similar language authorizing the seizure and search of the cellphone. Id. at 132–33 (cleaned up). All parties, including the government, agreed in the district court and on appeal that the CASS did not authorize a search of the suspect's cellphone, and the Fourth Circuit's analysis focused on the good-faith exception. See id. at 135. Unlike in Ray, S/A Penniman's affidavits (through incorporation by attachment) and Attachment C (through incorporation by attachment and reference) were incorporated into the warrants, and the plain language of the warrants authorized a search of Kuhn's cellphone. See Hurwitz, 459 F.3d at 470–71. Thus, Ray does not help Kuhn.

Alternatively, even if the warrants merely authorized the "seizure" of Kuhn's cellphone, the court holds that under Federal Rule of Criminal Procedure 41(e)(2)(B), the authority to seize Kuhn's cellphone in the warrants included the implicit authority to search the cellphone too. Rule 41(e)(2)(B) applies to warrants authorizing "the seizure of electronic storage media or the seizure or copying of electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). Rule 41(e)(2)(B) says, "Unless otherwise specified, [a] warrant ['authorizing the seizure of electronic storage media or the seizure or copying of electronically stored information'] authorizes a later review of the media or information consistent with the warrant." Id. (emphasis added). Rule 41(e)(2)(B) became effective in 2009. The Advisory Committee notes to the 2009 amendment emphasize the two-step "process inherent in searches for electronically stored information[:]" (1) officers seize or copy the entire storage medium, such as a cellphone or computer; and (2) officers conduct a later review of the seized electronic storage media or electronically stored information in the cellphone or computer to determine what electronically stored information falls within the scope

41

of the warrant and that review does not require a new search warrant and need not take place within the time period for executing the warrant. See Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendment; see, e.g., Zelaya-Veliz, 94 F.4th at 338; United States v. Caesar, 2 F.4th 160, 179 (3d Cir. 2021); United States v. Pearson, 832 F. App'x 679, 687 (11th Cir. 2020) (unpublished); United States v. Cleveland, 907 F.3d 423, 430–31 (6th Cir. 2018); United States v. Carrington, 700 F. App'x 224, 232 (4th Cir. 2017) (unpublished); United States v. Fifer, 863 F.3d 759, 766 (7th Cir. 2017); United States v. Ganias, 824 F.3d 199, 210 n.23 (2d Cir. 2016) (en banc).

Numerous courts have interpreted Rule 41 to mean that a Rule 41 warrant that authorizes the seizure of electronics also implicitly authorizes a subsequent search of the electronics "unless otherwise specified" by the issuing magistrate judge. See Pearson, 832 F. App'x at 687; Fifer, 863 F.3d at 766 ("Why, then, would the issuing judge order the police to seize an item—such as a computer . . . —only to have them reapply for an essentially identical warrant to search the item seized?" (cleaned up)); United States v. Beckett, 369 F. App'x 52, 56–57 (11th Cir. 2010) (per curiam) (unpublished) (holding that the government did not exceed the bounds of the search warrant, which authorized the seizure of the defendant's computer and hard drives, where the affidavit described the objective of the search, explained the pertinent information on his computer, and described with particularity the items to be searched and the objectives of the search); United States v. Quinonez, No. 18-20946-CR-ALTONAGA/Goodman, 2020 WL 1526473, at *2 (S.D. Fla. Mar. 31, 2020) (unpublished) ("A warrant that authorizes the seizure of electronics implicitly authorizes a subsequent search of the electronics."); see also United States v. Kneubuhler, No. 123CR47MHCJEM, 2023 WL 5488475 (N.D. Ga. Aug. 3, 2023) (unpublished) (holding that a warrant that authorized a search of the home and a seizure of electronic devices implicitly authorized a search of the electronic devices under Federal Rule of Criminal Procedure

42

41(e)(2)(B)), report and recommendation adopted, No. 1:23-CR-47-MHC-JEM, 2023 WL 5490120 (N.D. Ga. Aug. 24, 2023) (unpublished); United States v. Perry, No. CV116CR334MHCLTW, 2017 WL 9473406, at *9 (N.D. Ga. Aug. 4, 2017) (unpublished) (holding that the search of the computer was lawful because a "second search warrant to search the contents of a seized computer [is not necessary] if the original search warrant only authorized law enforcement agents to 'search for and seize' the computer"), report and recommendation adopted, No. 1:16-CR-334-MHC-LTW, 2017 WL 4031469 (N.D. Ga. Sept. 13, 2017) (unpublished); United States v. Reichling, No. 13-CR-126-BBC, 2014 WL 11394551, at *1 (W.D. Wis. June 4, 2014) (unpublished) (stating that it is "implicit in a warrant authorizing seizure of electronic storage devices that the seized devices may be examined for their contents"), aff'd, 781 F.3d 883 (7th Cir. 2015); cf. United States v. Johnson, 93 F.4th 605, 608, 613–15 (2d Cir. 2024) (acknowledging, but not expressly holding, that where a federal judge issues a warrant under Federal Rule of Criminal Procedure 41(e)(2)(B) authorizing a search of the suspect's house and a seizure of electronic devices for evidence of child pornography crimes, the government need not obtain a second search warrant for its later review of the cellphone under the two-step process authorized under Rule 41(e)(2)(B)), cert. denied 145 S. Ct. 276 (2024).

In opposition, Kuhn ignores Rule 41(e)(2)(B) and cites Riley v. United States, 573 U.S. 373 (2014). Riley, however, "concerned the search of phones seized incident to arrest, not items seized pursuant to a search warrant authorized by a magistrate judge, as here." Quinonez, 2020 WL 1526473, at *2; see, e.g., Caesar, 2 F.4th at 179; Pearson, 832 F. App'x at 687; Fifer, 863 F.3d at 766 n.6; Ganias, 824 F.3d at 210 n.23; cf. Riley, 573 U.S. at 385 ("Th[is] case[] require[s] us to decide how the search incident to arrest doctrine applies to modern cell phones . . . .").

43

Kuhn also cites Ray. Ray, however, involved a CASS, which is a military warrant. Ray did not involve a Rule 41 warrant issued by a United States Magistrate Judge. See Ray, 141 F.4th at 132.

Here, United States Magistrate Judge Jones issued the warrants under Federal Rule of Criminal Procedure 41. Judge Jones authorized the search for, the seizure of, and the search of electronics, including "computer[s]," "mobile telephone devices," "mobile data storage devices," "videotapes," and "video recording devices." See [D.E. 83-1] 74; [D.E. 83-2] 74. Judge Jones also authorized the search for, the seizure of, and the search of electronic storage media or electronically stored information, including "computer software," "computer passwords," "e-mail messages," "chat logs," "electronic messages," and "other digital data files." See [D.E. 83-1] 74–78; [D.E. 83-2] 74–78. Judge Jones did not include in the warrants any restrictions on a subsequent search of these devices or the electronically stored information. Under Rule 41(e)(2)(B), the authorization to search for and to seize Kuhn's cellphone and the electronically stored information on it authorized a later search of the cellphone without obtaining a second search warrant. See Pearson, 832 F. App'x at 687; Fifer, 863 F.3d at 766; Ganias, 824 F.3d at 210 n.23; Beckett, 369 F. App'x at 56–57; Kneubuhler, 2023 WL 5488475, at *7; Quinonez, 2020 WL 1526473, at *2; Perry, 2017 WL 9473406, at *9; Reichling, 2014 WL 11394551, at *1. Thus, even in a counterfactual world where the warrants had no language authorizing the search for, the seizure of, and the search of Kuhn's cellphone, the authorization to "seize" the cellphone under Federal Rule of Criminal Procedure 41(e)(2)(B) implicitly authorized a search of Kuhn's cellphone and its electronically stored information for the information identified on the first page of the warrant and Attachment C.

44

## 2.

Next, Kuhn argues that, even if the warrants did authorize a search of Kuhn's cellphone, the agents were not allowed to search third-party applications on Kuhn's cellphone such as Telegram or Session. See [D.E. 82] 18–20. In support, Kuhn cites United States v. Zelaya-Veliz, 94 F.4th 321 (4th Cir. 2024). Kuhn argues that "[i]f Agent Penniman . . . wanted to search the private communications maintained on Mr. Kuhn's Telegram and Session accounts, the Fourth Amendment required the agents to secure a warrant, supported by probable cause, which was directed to Telegram and Session and which commanded a production of Mr. Kuhn's private communications." [D.E. 82] 19–20.

The court rejects this argument. Zelaya-Veliz does not hold that agents cannot enter a digital application on a cellphone during a cellphone search authorized by a search warrant for that cellphone unless they obtain a search warrant for the third-party application. Rather, in Zelaya-Veliz, the Fourth Circuit held that if agents ask a company like Facebook for a user's private electronic communications instead of retrieving the communications directly from the user's phone, then the agents must have a warrant. See 94 F.4th at 326, 333–34. Unlike in Zelaya-Veliz, officers retrieved Kuhn's chats directly from the third-party applications on Kuhn's cellphone, and the warrants authorized the agents to do so. See, e.g., United States v. Williams, 592 F.3d 511, 519–22 (4th Cir. 2010).

## 3.

Next, Kuhn argues that, to the extent the warrants authorized a search of Kuhn's cellphone and applications such as Session and Telegram, the warrants are overbroad, lacking both probable cause and particularity. See [D.E. 82] 23–28. The court disagrees.

45

The Fourth Amendment requires that warrants be based on probable cause and "particularly describ[e] the place to be searched, and the persons or things to be seized." United States v. Blakeney, 949 F.3d 851, 861 (4th Cir. 2020) (citation omitted); see Uzenski, 434 F.3d at 706. A reviewing court must give a judicial officer's probable cause determination "great deference." United States v. Blackwood, 913 F.2d 139, 142 (4th Cir. 1990); see United States v. Darosa, 102 F.4th 228, 233–34 (4th Cir. 2024), cert. denied, 145 S. Ct. 342 (2024). "[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith." Messerschmidt v. Millender, 565 U.S 535, 546 (2012) (quotation omitted); see Leon, 468 U.S. at 922–23. "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." District of Columbia v. Wesby, 583 U.S. 48, 57 (2018) (cleaned up); see Maryland v. Pringle, 540 U.S. 366, 371 (2003); Illinois v. Gates, 462 U.S. 213, 241–46 (1983); United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004). Probable cause exists "when, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Zelaya-Veliz, 94 F.4th at 334 (cleaned up); see Ornelas v. United States, 517 U.S. 690, 696 (1996); Gates, 462 U.S. at 238; United States v. Briscoe, 101 F.4th 282, 294 (4th Cir. 2024); Blakeney, 949 F.3d at 859. "Probable cause is not a high bar." Wesby, 583 U.S. at 57; see Moretti, 2025 WL 2921438, at *8 ("The probable cause bar is a low one . . . .").

The Fourth Amendment's particularity requirement prohibits broadly phrased warrants that authorize officers to conduct "exploratory rummaging in a person's belongings." United States v. Dargan, 738 F.3d 643, 647 (4th Cir. 2013); Andresen v. Maryland, 427 U.S. 463, 480 (1976).

46

"[T]he Fourth Amendment's particularity requirement assures the subject of the search that a magistrate has duly authorized the officer to conduct a search of limited scope." Groh v. Ramirez, 540 U.S. 551, 565 n.9 (2004).

Under the particularity requirement, the court must "construe search warrants in a commonsense and realistic manner, avoiding a hypertechnical reading of their terms." United States v. Cobb, 970 F.3d 319, 327–29 (4th Cir. 2020) (rejecting particularity challenge where warrant authorized search for evidence of a murder on defendant's computer and officer inadvertently discovered child pornography); see United States v. Phillips, 588 F.3d 218, 225 (4th Cir. 2009) (noting that "[a] warrant need not—and in most cases, cannot—scrupulously list and delineate each and every item to be seized"); United States v. Dornhofer, 859 F.2d 1195, 1198 (4th Cir. 1988) ("[W]e do not read the search warrant as a constitutional strait jacket: that only those items particularly described in it may be seized without regard to the facts and circumstances of the particular case." (quotation and citation omitted)); United States v. Jacob, 657 F.2d 49, 52 (4th Cir. 1981) (recognizing that "[t]he degree of specificity required . . . may necessarily vary according to the circumstances and type of items involved"). A warrant satisfies the particularity requirement when it describes the items to be searched for and seized "in a manner that allows an executing officer to know precisely what he has been authorized to search for and seize." Cobb, 970 F.3d at 328–29; Blakeney, 949 F.3d at 863. When a warrant does not otherwise describe the evidence to be searched for and seized, that gap can be filled if the warrant instead specifies the relevant offense. When there is "specific illegal activity" that tends to "generate[] quite distinctive evidence," such as bank robbery or possession, receipt, or distribution of child pornography, officers can typically "identify the property sought with reasonable certainty." Blakeney, 949 F.3d at 862–63.

47

The search warrants authorized law enforcement to search for, seize, and search all chat logs and electronic messages (1) pertaining to the possession, receipt, or distribution of child pornography, (2) to identify persons transmitting child pornography, (3) establishing communications between individuals about child pornography or sites on the internet to obtain child pornography, and (4) establishing membership in online groups, clubs or services that make child pornography accessible. See [D.E 83-2] 71–73.

The court finds that probable cause supported the search warrants for Kuhn's cellphone, including searches of all electronic communication applications on the cellphone. First, based on S/A Neefe's Discord chat with Kuhn, there was probable cause to believe that Kuhn was sexually abusing the minors in his home. See [D.E. 83-1] 20 ("Love incest myself."); id. at 25 (admitting to "playing" with Minor 1); id. at 33 (admitting that he began sexually abusing Minor 1 by performing oral sex when changing diapers); id. at 43 (stating that he abused all three minors); id. at 37 (admitting that he had sexual contact with Minor 1 "a few times a week" but "sometimes daily"); id. at 31 (admitting to ejaculating on Minor 1). Kuhn's statements against interest are damning evidence of child sex offenses. Cf. Donnelly v. United States, 228 U.S. 243, 278 (1913) (Holmes, J., dissenting) ("[N]o other statement is so much against interest as a confession of murder . . . .").

Second, agents had probable cause to believe that Kuhn was using electronic communication applications, such as Session and Discord, to commit crimes involving the sexual exploitation of minors. See [D.E. 83-1] 20–21 ("I use Session mostly, especially for these kinds of convos. Then I don't have to give out my # plus it's all discreet and encrypted."); id. at 50 (admitting to meeting another man on Grindr, with whom he exchanged photos and met in person to sexually abuse the man's grandchildren).

48

Third, agents had probable cause to believe that Kuhn was producing child sexual abuse material and encouraging others to do the same. See id. at 28 (intimating that he had child sexual abuse images of Minor 1 that he would only share if reciprocated); id. at 34 ("I do have several pictures of me and [Minor 1] playing if you ever have anything you'd like to exchange."); id. (sending a photo of a shirtless small-chested pre-pubescent minor Caucasian with blonde/brown hair); id. at 36, 39 (asking S/A Neefe for a photo of his 12-year-old fictitious son in exchange for a "pic of [Kuhn's] cock all over [Minor 1]"); id. at 40–42 (encouraging S/A Neefe to take photos of his fictitious 12-year-old without his knowledge to get him used to the idea of illicit photos); id. at 50 (admitting that a grandfather he met on Grindr sent him explicit images of his grandchildren).

Fourth, agents had probable cause to believe that Kuhn was using the Internet to coordinate in-person meetings to sexually abuse children. See id. at 29–31 (discussing meeting in-person and Kuhn's desire to sodomize the 12-year-old fictitious boy); id. at 31 (discussing swapping children and limits on sexual contact with Minor 1: Minor 1 is "too small to penetrate," but Minor 1 "can stroke you and you can lick" and "cum all over" Minor 1); id. at 33 (stating that depending on how "big" the 12-year-old boy's penis was, maybe Kuhn could "get him inside [Minor 1]" when they meet in-person).

Kuhn argues that the affidavits only established probable cause related to child sexual abuse material on Grindr and Discord and not an "unfettered rummaging" through Kuhn's Telegram and Session applications. [D.E. 82] 23. The court disagrees. In the messages with S/A Neefe, Kuhn mentioned multiple times that he preferred Session because it was encrypted. Moreover, when the item to be searched is a digital device, the Fourth Circuit has held that agents are allowed to "open and view all . . . files, at least cursorily, to determine whether any one falls within the terms of the warrant." Williams, 592 F.3d at 522 (citation omitted); see United States

49

v. Grinder, 808 F. App'x 145, 148 (4th Cir. 2020) (per curiam) (unpublished). Thus, law enforcement was authorized and justified in searching other chat applications on Kuhn's phone given the "fair probability" that Kuhn used them to produce, distribute, receive, or possess child sexual abuse material. Zelaya-Veliz, 94 F.4th at 334; Ornelas, 517 U.S. at 696; Gates, 462 U.S. at 238; Briscoe, 101 F.4th at 294; Blakeney, 949 F.3d at 859; Williams, 592 F.3d at 519–22.

The court also finds that the search warrants were particularized. The warrants referenced both the "specific illegal activity" and the evidence to be searched for and seized, exceeding what is necessary to satisfy particularity. See, e.g., Cobb, 970 F.3d at 328–29; Blakeney, 949 F.3d at 862–63. The warrants were limited to a search and seizure of items evidencing production, distribution, receipt, or possession of child pornography. See, e.g., [D.E. 83-1] 1; [D.E. 83-2] 1. A reasonable officer would know that one type of evidence relevant to that specific criminal activity is electronic devices and the contents therein. See, e.g., Cobb, 970 F.3d at 328–29; Blakeney, 949 F.3d at 862–63. Furthermore, in Attachment C, the warrants list specific items to be searched for, seized, and searched, such as computers, mobile phones, digital data files, digital recording devices, chat logs, electronic messages, photographs and videos. All these items are reasonably connected to the production, distribution, receipt, or possession of child pornography.

In opposition, Kuhn cites two cases involving homicide investigations in which the court held that a warrant permitting a search of the entire cellphone was overbroad because probable cause existed only for specific phone evidence, such as call logs and GPS tracking. See Burns v. United States, 235 A.3d 758, 766, 774, 777–78 (D.C. App. 2020) (authorizing a search of the suspect's entire phone when he was accused of homicide, a crime that typically does not occur over a mobile phone, and the affidavit only supported probable cause to look for phone calls between individuals involved in the investigation and GPS tracking); Taylor v. State, 260 A.3d

50

602, 604, 609–10 (Del. 2021) (en banc) (authorizing a warrant for the entire cellphone, including "any/all data stored by whatever means," based only on the assertion that "people involved in criminal acts like those described in [the] affidavit use smartphones to communicate about their illegal acts"). Unlike in Burns and Taylor, production, distribution, receipt, or possession of child pornography is a crime largely committed through the use of digital devices, including cellphones. Therefore, it was reasonable to authorize the search for, seizure of, and search of the relevant evidence listed in Attachment C on Kuhn's cellphone.

Kuhn also cites United States v. Winn, 79 F. Supp. 3d 904 (S.D. Ill. 2015), which involved an investigation into a misdemeanor charge for public indecency. The suspect was accused of taking photos of young girls at a community pool while rubbing his genitals. See id. at 909. A judicial officer issued a search warrant for "any or all files" on the suspect's cellphone that constituted evidence of public indecency, such as "the calendar, phonebook, contacts, SMS messages, MMS messages, emails, pictures, videos, images, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, [and] internet history and usage." Id. at 919. Officers found child pornography on the phone. See id. at 911. The court held that the warrant was facially overbroad because it exceeded the probable cause that supported it. See id. at 919. The court explained that the only categories of data for which the police had probable cause were photos and videos. See id. Furthermore, the court noted that the warrant did not have a temporal limit given that the officers only had probable cause for the photos and videos taken on that particular day at that community pool. See id. at 921.

Unlike in Winn, all the items searched for, seized, and searched, in this case are directly linked to the offense conduct described in S/A Penniman's affidavits. Moreover, the affidavits supported probable cause to believe that child molestation, which is a necessary part of producing

51

child pornography, occurred over an extended period of time. Unlike in Winn, this was not a case where Kuhn was suspected of engaging in specified illegal conduct on one day at a certain location. Rather, Kuhn admitted to S/A Neefe in the Discord chat that he had abused all three minors over the years, and the affidavits stated that the minors were believed to be between the ages of three and eight. Based on this information, probable cause existed to believe that Kuhn's sexual abuse dated back eight years, and Judge Jones authorized the agents to search the cellphone accordingly. Thus, the court finds that the warrants articulated the specific illegal activity and the specific types of items to be searched for, seized, and searched, thereby allowing the executing officers "to know precisely" what they were authorized to search for, seize, and search. Cobb, 970 F.3d at 328–29; Blakeney, 949 F.3d at 862–63.

B.

Alternatively, the government argues that even if the warrants were deficient (and they were not), the good-faith exception applies. The court agrees.

The exclusionary rule is not a "strict-liability regime." Davis v. United States, 564 U.S. 229, 240 (2011). For that reason, various exceptions to the exclusionary rule exist. For example, "the Supreme Court recognized a good faith exception to [the exclusionary rule], under which evidence obtained by an officer who acts in objectively reasonable reliance on a search warrant will not be suppressed, even if the warrant is later deemed invalid." United States v. Thomas, 908 F.3d 68, 72 (4th Cir. 2018) (citation omitted); see Leon, 468 U.S. at 922. In other words, the good-faith exception to the exclusionary rule allows courts to admit evidence obtained in violation of the Fourth Amendment but in reasonable reliance on a warrant that a court later finds deficient. See, e.g., United States v. Seerden, 916 F.3d 360, 366–68 (4th Cir. 2019). The Supreme Court explained that the "good-faith inquiry is confined to the objectively ascertainable question whether

52

a reasonably well trained officer would have known that the search was illegal" in light of "all of the circumstances." Leon, 468 U.S. at 922 n.23; see United States v. McKenzie-Gude, 671 F.3d 452, 459 (4th Cir. 2011).

The Supreme Court has identified five limitations to applying the good-faith exception: (1) a magistrate issues a warrant based on a deliberately or recklessly false affidavit; (2) a magistrate lacks neutrality and detachment; (3) a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (4) a warrant is so facially deficient that a reasonable officer could not believe it was valid; and (5) police recklessly maintain or knowingly enter false information into a warrant database to enable a future arrest. See Seerden, 916 F.3d at 366–67 (collecting cases). Each of these limitations is a situation in which exclusion of the evidence deters law enforcement officers from committing future Fourth Amendment violations.

The "sole purpose" of the exclusionary rule is deterring police misconduct. Davis, 564 U.S. at 246; see Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984); United States v. Wilks, 647 F.3d 520, 523 (4th Cir. 2011). Marginal deterrence does not warrant exclusion. See Wilks, 647 F.3d at 523 ("Where suppression fails to yield appreciable deterrence, exclusion is clearly unwarranted." (cleaned up)). The Supreme Court has made clear that if excluding the evidence only marginally deters future police misconduct "at a high cost to both the truth and the public safety," then the exclusionary rule does not apply. Davis, 564 U.S. at 232; see Herring v. United States, 555 U.S. 135, 141 (2009) (holding that the "deterrence must outweigh the costs" as the Court has "never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence" (citation omitted)). Thus, the Supreme Court and the Fourth Circuit have held that evidence seized or searched in a manner consistent with binding precedent

when it is seized or searched is not subject to suppression should the law change because suppression does not deter police misconduct. See Davis, 564 U.S. at 232; Wilks, 647 F.3d at 522–24; see also United States v. Taylor, 54 F.4th 795, 803–05 (4th Cir. 2022) (applying the good-faith exception where the statute then permitted cellphone records to be obtained by court order even though the statute underlying the court order was later held unconstitutional); United States v. Stephens, 764 F.3d 327, 337 (4th Cir. 2014) (holding that the warrantless GPS usage was conducted in objectively reasonable reliance on then binding precedent).

Here, an objectively reasonable officer would believe that the warrants explicitly authorized a search of Kuhn's cellphone. Based on Fourth Circuit precedent on incorporation, an objectively reasonable officer would believe the warrants in this case included all the documents attached at the time of execution: the face of the warrants, the warrant applications, the affidavits, and Attachments A through C. See Hurwitz, 459 F.3d at 470–71. Thus, an objectively reasonable officer would believe that she could rely on all of these documents in determining whether the warrants authorized a search of Kuhn's cellphone. See Davis, 564 U.S. at 232; Taylor, 54 F.4th at 803–05; Stephens, 764 F.3d at 337; Wilks, 647 F.3d at 522–24. Moreover, the two-step process in Federal Rule of Criminal Procedure 41(e)(2)(B) only made this belief even more objectively reasonable. See Fed. R. Crim. P. 41(e)(2)(B). The court finds that an objectively reasonable officer would believe the warrants authorized a search of Kuhn's cellphone.

First, S/A Penniman's attached affidavits clearly sought permission to search Kuhn's cellphone. S/A Penniman requested permission to "seize and search computers and related devices consistent with the scope of the requested search." See [D.E. 83-1] 11 (emphasis added); [D.E. 83-2] 11 (emphasis added). Furthermore, S/A Penniman described her need to recover deleted computer files on the electronic devices and stored electronic communications on Kuhn's Discord

54

and Grindr applications, which law enforcement can only recover if the warrants authorized a search of Kuhn's cellphone. See [D.E. 83-1] 14–15; [D.E. 83-2] 14–15. S/A Penniman also knew the "warrant permit[tted]" law enforcement to compel Kuhn to provide "biometric features necessary to the execution of the search authorized by this warrant." [D.E. 83-1] 66, 68 (emphasis added); [D.E. 83-2] 66, 68 (emphasis added); see also [D.E. 83-1] 69; [D.E. 83-2] 69. S/A Penniman concluded her affidavits by requesting "that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment C to include a full forensic examination of any computers, electronics, and related devices listed here." [D.E. 83-1] 71 (emphasis added); [D.E. 83-2] 71 (emphasis added). S/A Penniman appeared virtually before Judge Jones as he signed the warrants inches below this request.

Second, Attachment C, which was incorporated by reference and attachment into the warrants, authorized the search for, seizure of, and the search of Kuhn's cellphone. See [D.E. 81-1] 1; [D.E. 81-2] 1 (authorizing the agents to search for, seize, and search the items "particularly described in Attachment C, attached hereto and made a part hereof"). Attachment C authorized the agents to seize cellphones and computers and search them for applications, communications programs, chat logs, e-mail messages, electronic messages, computer files, digital data files, and web cache information. See [D.E. 83-1] 75–78; [D.E. 83-2] 75–78. Most items in Attachment C were electronically stored information located inside digital devices. S/A Penniman could not seize the electronically stored information unless law enforcement first searched for Kuhn's cellphone, seized it, and searched the cellphone. Moreover, S/A Penniman knew that Attachment C authorized her to compel Kuhn to provide biometric features for "any of the devices found on the premises" that are capable of containing evidence of production, distribution, receipt, or possession of child pornography "for the purpose of attempting to unlock the device's security

55

features in order to search the contents as authorized by this warrant." See [D.E. 83-1] 79 (emphasis added); [D.E. 83-2] 79 (emphasis added). Thus, the court finds that based on the plain language of the warrants, an objectively reasonable officer would believe the warrants authorized a search of Kuhn's cellphone. See Leon, 468 U.S. at 922 n.23; McKenzie-Gude, 671 F.3d at 459.

Furthermore, even if the warrants did not explicitly authorize a search of Kuhn's cellphone (which they do), S/A Penniman knew that Judge Jones, a United States Magistrate Judge, issued the warrants under Federal Rule of Criminal Procedure 41. Thus, an objectively reasonable officer would believe the authority to search for and seize Kuhn's cellphone included the authority to search it for electronically stored information evincing production, distribution, receipt, or possession of child pornography. See Fed. R. Crim. P. 41(e)(2)(B); Castro, 882 F.3d at 969 (stating that even if the Sixth Circuit was wrong about the interpretation of Federal Rule of Criminal Procedure 41(e)(2)(B), the good-faith exception would apply and the evidence would be admissible); see also Fifer, 863 F.3d at 766; Beckett, 369 F. App'x at 56–57; Kneubuhler, 2023 WL 5488475, at *7; Quinonez, 2020 WL 1526473, at *2; Perry, 2017 WL 9473406, at *9; Reichling, 2014 WL 11394551, at *1. Although the cases interpreting Rule 41 are not binding Fourth Circuit precedent, their analysis of Rule 41's text and the absence of a contrary ruling by the Fourth Circuit is informative concerning good faith. First, the court wants to incentivize officers to rely on the law as it is written, especially when no binding precedent interprets it differently. The Federal Rules of Criminal Procedure are promulgated under the Rules Enabling Act, 28 U.S.C. § 2072, and are "in every pertinent respect, as binding as any statute duly enacted by Congress . . . ." Bank of Nova Scotia v. United States, 487 U.S. 250, 255 (1988); see In re Nat'l Prescription Opiate Litig., 956 F.3d 838, 844 (6th Cir. 2020). Second, an objectively reasonable officer would believe that she had the authority to search Kuhn's cellphone when the

56

warrants authorized the search for and seizure of the cellphone. For these reasons, the court finds that, even if a different court construed the warrants to not authorize a search of Kuhn's cellphone and to only authorize its seizure, excluding the evidence from Kuhn's cellphone provides no deterrent value and comes at a "high cost to both the truth and the public safety." Davis, 564 U.S. at 232; Herring, 555 U.S. at 141; Taylor, 54 F.4th at 803–05; Stephens, 764 F.3d at 337; Wilks, 647 F.3d at 522–24. In light of all the circumstances, the court finds that a "reasonably well trained officer," such as S/A Penniman, would have reasonably believed that the search of Kuhn's cellphone was lawful. Leon, 468 U.S. at 922 n.23; see, e.g., McKenzie-Gude, 671 F.3d at 459.

In opposition, Kuhn cites United States v. Ray, 141 F.4th 129 (4th Cir. 2025), and argues that a search warrant that "plainly and unmistakably did not authorize" a search of Kuhn's cellphone cannot be saved by the good-faith exception. See [D.E. 82] 28. Ray is distinguishable.

In Ray, the parties agreed and the district court found as a fact that the CASS did not authorize a search of the suspect's cellphone. See 141 F.4th at 141. Moreover, although the agent in Ray requested the authority to search the suspect's cellphone in her affidavit, the CASS did not attach or reference any part of the affidavit. The Fourth Circuit explained that the good-faith exception cannot save an officer who "unreasonably exceeds the scope of an unambiguous warrant." Id. at 139. Moreover, the Fourth Circuit reasoned that "a total omission of the item to be searched" and a subsequent search of that item rendered the CASS "so facially deficient" that "the executing officers could not reasonably presume it to be valid." Id. at 136 (cleaned up). The Fourth Circuit affirmed the district court's findings of fact that the agent "did not abide by the plain terms of the CASS, which she herself drafted," and the district court properly declined to convert the agent's "lack of competence" into good faith. Id. at 139–40.

Judge Rushing dissented, arguing that the agent knew the affidavit requested a search of the cellphone, and based on all the circumstances, it was objectively reasonable for the agent to believe that the search of the cellphone was lawful. See id. at 142 (Rushing, J., dissenting). In response, the majority stated that three facts foreclosed applying the good-faith exception: (1) the parties agreed and the district court found that the CASS unambiguously did not authorize the agent to search the cellphone; (2) the district court found that the commander did not verbally authorize the agent to search the cellphone; and (3) the CASS did not incorporate any part of the affidavit that sought authority to search the cellphone. See id. at 140.

Unlike in Ray, the government vociferously (and correctly in this court's view) argues that the warrants authorized a search of Kuhn's cellphone. A reasonable officer, such as S/A Penniman, would believe that the warrants' scope included a search of Kuhn's cellphone. For example, unlike in Ray, the warrants expressly incorporated Attachment C, which called for the seizure of items, such as chat logs and e-mails, that can only be seized if a search of Kuhn's phone is authorized. Moreover, unlike in Ray, the warrants incorporated S/A Penniman's affidavits by reference (Attachments A, B, and C) and attachment (the entire affidavit), which requested authorization (in the affidavit) and then authorized the agents (in Attachment C) to search Kuhn's cellphone. See Hurwitz, 459 F.3d at 470–71. With language authorizing the search and the incorporation of S/A Penniman's affidavits, two of the three facts in Ray that barred the good-faith exception do not exist here. Furthermore, unlike in Ray, a United States Magistrate Judge issued the warrants under Rule 41 of the Federal Rules of Criminal Procedure, including the two-step process under Rule 41(e)(2)(B). The court finds that based on all the circumstances, it was objectively reasonable for S/A Penniman to believe that the search of Kuhn's cellphone was lawful. Thus, the good-faith exception applies.

IV.

The government argues that even if the court found that Kuhn's statements giving his passcode to law enforcement was inadmissible under the Fifth Amendment, the inevitable discovery doctrine applies to the evidence recovered from Kuhn's cellphone because Krieger, the forensic examiner, could have accessed the contents of Kuhn's cellphone without his passcode. The court agrees.

Under the "inevitable discovery" doctrine, "the government [can] use information obtained from an otherwise unreasonable search [or unlawful confession] if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017); see Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Alston, 941 F.3d 132, 136 (4th Cir. 2019) (affirming the district court's holding that contraband found in the suspect's car after an unlawfully obtained confession would not be excluded because the contraband would have been discovered under the automobile exception). For the inevitable discovery doctrine to apply, the government "must prove by a preponderance of the evidence: first, that police legally could have uncovered the evidence; and second, that police would have done so." Alston, 941 F.3d at 138. "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence." United States v. Whitehorn, 813 F.2d 646, 650 n.4 (4th Cir. 1987); see Nix, 467 U.S. at 447 ("[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings.").

59

To rely on the inevitable discovery doctrine, the government must prove that police had "lawful means" to discover the illegally obtained evidence. Nix, 467 U.S. at 444; see Alston, 941 F.3d at 138. "Lawful means" includes "an inevitable search falling within an exception to the warrant requirement" or a search pursuant to a valid warrant. Alston, 941 F.3d at 138; see Bullette, 854 F.3d at 265. Here, even if the court found that Kuhn's two statements to agents giving them his passcode were inadmissible (which it does not), the agents had valid search warrants for Kuhn's cellphone. Specifically, the agents had the authority to seize Kuhn's cellphone, take the cellphone to the Department of Homeland Security lab as part of the two-step process under Federal Rule of Criminal Procedure 41(e)(2)(B), and use software such as Graykey or Cellebrite to extract relevant evidence from Kuhn's cellphone.

On November 7, 2025, Krieger, a Department of Homeland Security forensic examiner, credibly testified at the suppression hearing about the procedure for extracting information from a cellphone like Kuhn's without a passcode. Once seized, a cellphone believed to contain contraband (such as child sex abuse material) is placed into an evidence locker, and the case agent puts the cellphone's data and information into the Department of Homeland Security system. Once that information is in the system, Krieger receives the cellphone from the case agent. Krieger then inventories the cellphone and attempts to extract the cellphone's contents. Occasionally, depending on the cellphone's specific build number and security patch, Cellebrite and Graykey will not support extraction of a cellphone's contents without a passcode. When this happens, the cellphone is still considered contraband and cannot be returned to the owner. Rather, Krieger returns the cellphone to the evidence locker and waits for an update in Cellebrite or Graykey that supports the extraction.

60

When agents seized Kuhn's cellphone on July 19, 2023, Graykey and Cellebrite did not have an update available to support extracting information from Kuhn's cellphone, a Google Pixel 6, without the passcode. But Krieger submitted the pedigree of Kuhn's cellphone to Cellebrite and Grayshift (the producer of Graykey), and Grayshift found that an update became available in March 2024 that would have allowed Krieger to extract the content on Kuhn's cellphone without the passcode. Thus, the government has proven by a preponderance of the evidence that, even without Kuhn's passcode, in March 2024, the government could have and would have lawfully extracted evidence from Kuhn's cellphone of production, distribution, receipt, or possession of child pornography. See, e.g., Nix, 467 U.S. at 444; Alston, 941 F.3d at 138; Bullette, 854 F.3d at 265.

To the extent that Kuhn argues this hypothetical cellphone extraction in March 2024 would have fallen outside the permissible 14-day window in July 2023 to execute the warrants that Judge Jones authorized, the court rejects the argument. As discussed, under Federal Rule of Criminal Procedure 41(e)(2)(B), the 14-day limitation does not apply to an off-site review of the cellphone. Rule 41(e)(2)(A) states that a "warrant must command the officer to [] execute the warrant within a specified time no longer than 14 days." Fed. R. Crim. P. 41(e)(2)(A). But Rule 41(e)(2)(B) clarifies what execution means concerning the seizure of "electronic storage media" or "electronically stored information." Fed. R. Crim. P. 41(e)(2)(B). The rule states: "Unless otherwise specified, the warrant ['authorizing the seizure of electronic storage media or the seizure or copying of electronically stored information'] authorizes a later review of the media or information consistent with the warrant." Id. (emphasis added). "The [14-day] time [limit] for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Id. Thus, where the warrant authorizes the seizure of

61

a cellphone or computer containing electronically stored information, agents must seize the cellphone or computer within the 14-day period, but agents can review the cellphone's contents after the 14-day warrant execution window unless the warrant states otherwise. See, e.g., Cleveland, 907 F.3d at 430–31; Castro, 881 F.3d at 968–69; United States v. Huart, 735 F.3d 972, 974 n.2 (7th Cir. 2013). The warrants in this case have no such limitation.

The 2009 amendment to Rule 41 authorized this process due to the "substantial amount of time" involved in forensic imaging and the "difficulties created by encryption" and the "workload of the computer labs." See Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendment; see, e.g., United States v. Whipple, 92 F.4th 605, 614 (6th Cir. 2024). Consistent with Rule 41(e)(2)(B) and the Advisory Committee's note, several courts have held that prolonged delays in reviewing electronics (such as cellphones) were "reasonable," especially when contraband is likely located on the electronic device or the delay results from the inability to bypass a passcode. See, e.g., United States v. Jarman, 847 F.3d 259, 266–67 (5th Cir. 2017) (affirming denial of motion to suppress computer data seized eight months after the warrant was executed and reviewed 23 months after the warrant was executed because the government needed to segregate attorney-client privileged materials and conduct a "forensic examination"); United States v. Anderson, No. 1:22-CR-9, 2025 WL 1360246, at *13–14 (W.D. Pa. May 9, 2025) (unpublished) (eight-month delay reasonable); United States v. Fofanah, No. 24 CR. 85-2 (AT), 2025 WL 1151474, at *2 (S.D.N.Y. Apr. 18, 2025) (unpublished) (15-month delay reasonable); United States v. Banwari, No. 3:23-CR-62, 2025 WL 35881, at *5–7 (W.D.N.C. Jan. 6, 2025) (unpublished) (six-year delay reasonable); United States v. Daskal, 676 F. Supp. 3d 153, 178–79 (E.D.N.Y. 2023) (23-month delay reasonable); United States v. Magana, No. 1:18-CR-68, 2022 WL 4237547, at *6 (E.D. Cal. Sept. 14, 2022) (unpublished) (collecting cases concerning

62

reasonable delay due to "encryption or an inability to access a locked phone"); <u>United States v.</u> <u>Dixon</u>, No. 3:20-CR-3, 2021 WL 1976679, at *2 (N.D. Ga. May 18, 2021) (unpublished) (holding that a two-year delay in searching the defendant's cellphone was reasonable because the cellphone was locked and the defendant did not provide the passcode); <u>United States v. Estime</u>, No. 19-CR-711, 2020 WL 6075554, at *8, 15 (S.D.N.Y. Oct. 14, 2020) (unpublished) (holding that the government's basis for its 10-month delay in searching the defendant's cellphones—the fact that the cellphones were locked, the defendant had not provided the passcodes, and "efforts to unlock the cellphones ha[d] been unsuccessful to date"—was "meritorious," and noting that the Advisory Committee credited this reason for delay); <u>United States v. Morgan</u>, 443 F. Supp. 3d 405, 406 (W.D.N.Y. 2020) (denying a defendant's motion to return a locked iPhone that had been seized 22 months earlier when the government still had not been able to unlock the iPhone); <u>United States</u> <u>v. Banks</u>, No. 09-CR-266, 2011 WL 13366231, at *6 (D. Colo. Feb. 9, 2011) (unpublished) (four-year delay reasonable).

Here, agents seized Kuhn's cellphone on July 19, 2023, which fell within the authorized 14-day period to execute the warrants. Thus, the agents complied with the warrants and Rule 41(e)(2)(A) when they seized Kuhn's cellphone. <u>See, e.g.</u>, <u>Cleveland</u>, 907 F.3d at 430–31; <u>Castro</u>, 881 F.3d at 969; <u>Huart</u>, 735 F.3d at 974 n.2. Furthermore, under Rule 41(e)(2)(B), the warrants authorized the agents to take Kuhn's cellphone off-site to extract the cellphone's contents.

In a counterfactual world where Kuhn had not voluntarily given the agents his passcode twice, the agents would have stored Kuhn's cellphone off-site until Grayshift released its March 2024 update, which would have allowed Krieger to bypass Kuhn's passcode and extract the cellphone's contents. The court finds that this counterfactual eight-month delay is reasonable given the inability to bypass the cellphone's passcode and the likelihood that evidence of

production, distribution, receipt, or possession of child pornography existed on Kuhn's cellphone. See Jarman, 847 F.3d at 266–67; Anderson, 2025 WL 1360246, at *13–14; Fofanah, 2025 WL 1151474, at *2; Banwari, 2025 WL 35881, at *5–7; Daskal, 676 F. Supp. 3d at 178–79; Magana, 2022 WL 4237547, at *6; Dixon, 2021 WL 1976679, at *2; Estime, 2020 WL 6075554, at *8, 15; Morgan, 443 F. Supp. 3d at 406; Banks, 2011 WL 13366231, at *6. Thus, under the inevitable discovery doctrine, the contents of Kuhn's cellphone are admissible even if the court suppressed Kuhn's two statements giving his passcode to S/A Everhart and S/A Penniman.

V.

In sum, the court DENIES Kuhn's motions to suppress his statements [D.E. 84] and cellphone evidence [D.E. 82]. Proposed jury instructions, proposed verdict forms, and proposed voir dire questions are due not later than November 21, 2025. The trial SHALL proceed on December 1, 2025.

SO ORDERED. This 17 day of November, 2025.

JAMES C. DEVER III
United States District Judge

64